**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. 04-61212 (CIV–Lenard/Klein)

**NIGHT BOX**
**FILED**

⊃⌐APR 1 2 2006

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| City of Hollywood, Florida, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'**
**RESPONSE TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

In 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq. (attached as Exhibit A), in recognition that "new, small, or unfamiliar churches in particular, are frequently discriminated against . . . in the highly individualized and discretionary process of land use regulation."[1]  This is precisely what happened to the Hollywood Community Synagogue ("HCS" or "the Chabad").[2]

According to the City of Hollywood Zoning and Land Development Regulations ("ZLDR" or "zoning code") houses of worship are "generally suitable" for single-family districts. See ZLDR § 5.3(G); see also id. at § 4.1(A).  Consistent with this principle, on February 14, 2001, the Hollywood Community Synagogue, a small congregation of Hasidic Jews, applied for a special exception to operate from two single-family homes at the edge of a residential area

---

1. 146 Cong. Rec. S7774, S7775 (daily ed. July 27, 2000) (joint statement of Senator Hatch and Senator Kennedy on RLUIPA) (hereinafter "Joint Statement").

2. "The word 'Chabad' is a Hebrew acronym for the three intellectual faculties of: *chachmah*-wisdom, *binah*-comprehension and *da'at*-knowledge."  See About Chabad-Lubavitch, *at* http://www.chabad.org.

-1-

known as Hollywood Hills.[3]  On May 10, 2001, the Board of Adjustment and Appeals ("BAA"),
the professional zoning-appeals board for the City of Hollywood, found that the Chabad had
complied with the four criteria set forth in the zoning code for special-exception uses and granted
the Chabad's application.  Commissioner Sal Oliveri, however, appealed that decision, and on
September 12, 2001, the Hollywood City Commission, after a meeting that went through the
night, reversed the BAA's decision, giving the Chabad one year to vacate its location.  See
Resolution No. R-2001-295 at 2 (Sept. 12, 2001) (attached as Exhibit B).  In the words of the
Mayor, "[It] means they will have to be gone."[4]  No other religious institution in the City of
Hollywood has ever been denied a special exception[5] or been told to stop using its property as a
house of worship within one year.[6]

     The Commission's decision on September 12, 2001, was not an ordinary zoning decision.
The police presence in City Hall was increased specifically for the Chabad's application,[7] and not
without reason; four of the seven Hollywood Commissioners described the Chabad's application
as "controversial."[8]  Community opposition to the Chabad was intense and appeared to be driven,
at least in part, by religious animus.  Residents of Hollywood Hills opposing the Synagogue's
application made comments such as, "We don't need these people in our community," and,
"[T]hese people are here; more of them are going to come."[9]  Twice the Mayor threatened to have

---

3. See Statement of Material Facts at ¶¶ 18, 20 ("SMF").

4. Gonzales Depo. at 168.

5. See SMF at ¶ 78.

6. At the end of the one-year period, in September 2002, the Chabad applied again for a special exception.
The City's professional zoning board granted that special exception.  And in March 2003, the zoning board again
granted the Chabad a temporary special exception.  Again, however, Commissioner Oliveri appealed that special
exception to the City Commission, and in June 2003, the Commission again denied the Chabad a special exception.
Since June 2003 the Chabad has been using its property for worship services pending the outcome of this litigation.

7. See SMF at ¶ 82.

8. See SMF at ¶ 84.

9. Depo. of K. Wasserstrom at 24–25.  Another witness present at the all-night meeting reports hearing
"anti-Semitic" statements from members of the crowd.  See Gonzales Depo. at 146

citizens removed from the hearing room.[10]  Commissioner Wasserstrom stated that the controversy surrounding the Chabad's application formed part of the basis for the City's actions.[11]

Commissioner Oliveri—without whose efforts the BAA decision would not have come before the Commission—also made comments evincing religious bias.  During the September 12 meeting, Commissioner Oliveri told the Chabad's attorney, "Your people need to stay on the north side of Sheridan Street," where Hollywood's Orthodox Jewish Community has traditionally been concentrated.[12]  Equally troubling was Commissioner Oliveri's response to a question regarding religious gatherings at the home of Rosa Lopez, a woman who claims to receive visions of the Virgin Mary and who regularly hosts religious services at her single-family home.  See Part II(B), infra.  When asked whether the City should also prohibit religious gatherings at the Lopez home, Commissioner Oliveri responded that although there is "a lot of disturbance out there with the parking. . . . the spiritual benefit that may be achieved by the people going [to the Lopez home] once a month far outweighed the inconvenience of that occasion."[13]  Such a clear expression of religious preference and bias from the City Commissioner responsible for bringing the Chabad's application before the Commission taints the City's actions.

The City's resolution ordering the Synagogue to vacate its property was only the beginning of the Chabad's troubles.  Immediately following the September 12, 2001, meeting, the City targeted the Chabad for harassment with both its code enforcement and police departments.  In an eleven-month period, police officers conducted 102 self-initiated visits to the property.[14]  Code enforcement officers were also directed to visit the Chabad on a daily basis, an unprecedented level of enforcement that three City officials, including a City Commissioner, described as "excessive."  See SMF at ¶¶ 88-89, 93-94; see also Gonzales Depo. at 16–17 ("We visited the Chabad on a regular basis, . . . and it was continuous, continuous, continuous, and I

_____

10.  See SMF at ¶ 83.

11.  See SMF at ¶ 86.

12.  See SMF at ¶ 80.  Both the population of Orthodox Jews in Hollywood and all of the Orthodox synagogues in the City are concentrated north of Sheridan Street and outside of Hollywood Hills.  See SMF at ¶¶ 15, 16.

13.  See SMF at ¶ 81.

14.  See SMF at ¶ 90.

felt maybe a little too continuous or excessive."); Anderson Depo. at 34–35.  Commissioner Oliveri, in violation of City procedures, insisted on regular reports of code enforcement and police activity at the Chabad.[15]  Yet at the same time, identical violations at other houses of worship throughout Hollywood went unpunished and continue to go unpunished.[16]

The harassment of the Chabad reached its height on October 16, 2003, when the Defendant sent the Chabad a letter notifying the congregation that it "must desist holding services and other related activities" as of October 20, 2003.  Shortly afterward, the Department of Justice notified the Defendant that it had begun investigating whether the City had violated RLUIPA in its treatment of the Chabad.  Approximately one year later, on July 7, 2004, and before that investigation was completed, the Commission voted to file a lawsuit to enjoin all organized religious services at the Chabad's property.  The Commission took this action despite the fact that the item was not on the agenda and no notice had been given to either the Chabad or the public that such a vote would take place.[17]  The Mayor later admitted that "[i]t would have been better to have put [the vote] on the agenda."[18]

These facts, and others discussed below, evince religious discrimination.  Nevertheless, the City moves for summary judgment.  The City, however, has failed to establish that there is no dispute of material fact concerning whether certain properties that the City treated differently from the Chabad are not similar to the Chabad.  The City has also failed altogether to address evidence that supports the United States' discrimination claim.  Accordingly, the City's motion for summary judgment should be denied.

---

15. See SMF at ¶¶ 91-92.

16. See SMF at ¶¶ 38, 101-104.

17. See SMF at ¶ 97.

18. See SMF at ¶ 98.

## II.   FACTS AND PROCEDURAL BACKGROUND

On September 15, 2004, the Chabad filed suit against the City alleging, among other things, selective enforcement of City ordinances and discrimination on the basis of religion.  On April 26, 2005, the United States also filed suit alleging that Defendant subjected the Chabad to unequal treatment and discrimination in violation of RLUIPA.  See 42 U.S.C. § 2000cc(b)(1), (2).

### A.   The Office of Planning and the City's Zoning Code.

Uses such as a day care or a house of worship may occur in a residential area in Hollywood only pursuant to a special-exception permit.  See ZLDR § 4.1(A).  With respect to special-exception uses, the zoning code treats multi-family residential areas the same as single-family residential areas, compare ZLDR § 4.1(A), with § 4.2(A), and the identical criteria apply in both areas, see id. at § 5.3(G)(1).  Those criteria are:

    a. That the use is compatible with the existing natural environment and other properties within the vicinity;
    b. That there will be adequate provision for safe traffic movement, both vehicular and pedestrian, both internal to the use and in the area which will serve the use;
    c. That there are adequate setbacks, buffering, and general amenities in order to control any adverse effects of noise, light, dust and other potential nuisances; and
    d. That the land area is sufficient, appropriate and adequate for the use as proposed.

ZLDR at § 5.3(G)(1).  Primary responsibility for determining whether a property owner must apply for a special exception rests with the City's Planning Director, who oversees the Office of Planning.  See SMF at ¶ 11.

In addition to requiring special-exception approval for houses of worship and day care centers, the City also requires prior approval for certain "accessory uses," specifically uses that are not "customarily associated with single family homes."  See ZLDR § 4.1(E).  Again, the Planning Director is responsible for examining the specific accessory use in question and determining whether the use should be permitted.  Id.

### B.   Evidence of Discrimination.

As noted above, there is substantial evidence, including comments from citizens and City Commissioners, that the City's September 2001 decision to make the Chabad relocate was discriminatory and made on the basis of the Chabad's religious denomination, namely, Hasidic Judaism.  There is also substantial evidence that the City discriminated against the Chabad by treating it differently than other properties.  The Chabad was required to apply for a special

exception, other similarly situated properties were not. Other religious institutions in Hollywood received special exceptions; only the Chabad did not. Only the Chabad was subjected to daily visits by code enforcement officers.[19] Only the Chabad received a limit on the number of people who could attend its services. Only the Chabad was given one year to stop using its property for religious services.

1. **Properties that were never required to apply for a special exception.**

On Saturday, August 13, 2005, over 300 people gathered for a religious service at 1301 N. 66th Avenue in Hollywood, a single-family home belonging to a woman named Rosa Lopez. See SMF at ¶ 37. Following an organized rosary service that was broadcast over a loudspeaker to people gathered on a sidewalk opposite the house, Ms. Lopez and a handful of volunteer assistants sprinkled "holy water" on people who had come seeking healing for physical ailments. Id. at ¶ 39, 40. Volunteers also staffed a table where rosaries, candles, and religious statues, all bearing price tags, were displayed. Id. at ¶ 48.

The gathering that took place on August 13, 2005, was not an anomaly. Rosa Lopez has claimed to receive apparitions of the Virgin Mary since the early 1990s, and since 1994 crowds of religious pilgrims have gathered at her home on the 13th of every month to participate in a rosary service and to hear Ms. Lopez deliver a message from the Virgin Mary. See SMF at ¶ 24. A non-profit organization, the Our Loving Mother's Foundation, was established to help Ms. Lopez deliver her message. See SMF at ¶¶ 44–46. The Foundation maintains a website and prints a monthly newsletter that provides directions for pilgrims to the Lopez home. Id. Those pilgrims gather to hear Ms. Lopez's message in the home, on the sidewalks surrounding the home, in the garden, and in what is known as the "Apparition Room," a room with a separate entrance from the residential portion of the house, that is open to the public not just on the 13th, but throughout the month. Id. at ¶¶ 37, 43, 47.

The religious activities that take place at the Lopez home are not limited to the 13th of each month. The Apparition Room is open daily. See id. at ¶ 43. Hours during which the room is open are posted on the property, see id., and a volunteer from the Loving Mother's Foundation,

---

19. As noted above, those daily visits began in October 2001, and continued through approximately March 2003.

on at least some occasions, attends the room. Id. at ¶ 47.  There is also evidence that prayer gatherings take place at the Lopez home on Catholic holy days of obligation, at least on some Sundays, and on other days of the week.  See id. at ¶¶ 42.

The activities that take place at the Lopez home have a tangible impact on the surrounding neighborhood, something the City has long known.  For example, in February 1996, the City received a complaint about noise at 1301 N. 66th Ave from a resident seven blocks away.  See SMF at ¶ 33.  Residents have also complained to the City about illegal parking associated with the religious gatherings at the Lopez home.  See id. at ¶ 34.  The City responded by sending police to help manage the crowds that visit the home and to put up traffic barricades. See id. at ¶ 36.

In January 1995, the City's Planning Department determined that 1301 N. 66th Ave. "may be characterized as 'a place of worship'" that requires a special exception.  See SMF at ¶ 27.  And although it was the informal opinion of the City Attorney at the time that Ms. Lopez was not operating a house of worship, see Def's Memo. of Law at 17, that fact is immaterial.  The City never made a formal determination that Ms. Lopez was not operating a house of worship.  See SMF at ¶ 30.  The City never requested that Ms. Lopez apply to the Office of Planning for permission to use her home for "other accessory uses."  Id. at ¶ 49.  Nor did the City ever determine, consistent with its zoning code, that the use of the Lopez home as a place to host large religious gatherings is an "accessory use" that is "consistent with the [City's] Comprehensive Plan."  Id. ¶ 51.  The City never required Rosa Lopez or the Loving Mother's Foundation to apply for a special exception for permission to operate a house of worship at 1301 N. 66th Ave.[20]

The City also never required Father Ken Rosato to apply for a special exception.  Ken Rosato is an ordained priest in the Catholic Church in America and owns a single-family home, in an area zoned for single-family use, at 1406 Coolidge Street.  See SMF ¶ 116.  In the fall of 2000, Mr. Rosato began renovating his home to accommodate religious services.  See id. ¶ 117.  From November 2000 until the fall of 2002, Mr. Rosato presided over weekly religious services at his home involving anywhere from 8 to 30 persons.  See id. ¶ 118.

In approximately August 2001, one of Mr. Rosato's neighbors complained to the City of Hollywood about the religious gatherings that were taking place 1406 Coolidge Street.  See id. ¶

---

20.  Commissioner Wasserstrom stated that the City has not asked Ms. Lopez to apply for a special exception to date because to do so would make the City "look bad."  See SMF at ¶ ___.

119. A code enforcement officer responded by posting a notice of violation directing Father Rosato to cease using the property as a house of worship. See id. ¶ 120. Father Rosato responded, in turn, by showing the code enforcement officer a copy of RLUIPA. See id. ¶ 121. He was never asked to apply for a special exception. See id.[21]

### 2. Properties that received special exceptions but did not meet all four criteria, or did not come before the City Commission.

The Chabad was also treated differently than properties that were never required to appear before the City Commission or that violated at least one of the special-exception criteria, but still received a special exception.

For fifteen years, the Apostolic Christian Church ("ACC") operated as a religious assembly or house of worship from a single-family home located at 1713 Dewey Street without being required to obtain a special exception. See SMF ¶¶ 108-109. ACC's property, located in the middle of a block in a multifamily residential district, was surrounded on all sides by residential properties. Id. ¶ 110. In 2002, the City requested that ACC apply for a special exception. Id. ¶ 109. ACC complied. Although the home was surrounded by residential properties, in 2002, the City's Development Review Board ("DRB"), the successor body to the BAA, granted a special exception to allow the conversion of a home at 1713 Dewey Street into a house of worship. See id. ¶ 111. The special exception included no limit on the number of persons allowed at the property. See id. ¶ 112. No Commissioner appealed. See id. ¶ 113.

In 1997, St. Mark's Lutheran Church also applied for a special exception to convert a single-family home located at 502 N. 28th Avenue into a meeting hall. See id. ¶ 143. Although 502 N. 28th Ave. was zoned for single-family use and was surrounded to the south and east by other single-family homes, the Planning Division recommended conditional approval, and the BAA approved the application. See id. ¶¶ 142, 145-147. The special exception imposed two conditions, the construction of a fence along the east property line, and the installation of trees along adjacent swales. See id. ¶ 148. It included no limitation on the number of persons allowed at the property. No Commissioner appealed. See id. ¶ 149.

Advent Christian Cathedral operates from a converted meeting hall at 725 North 64th

---

21. Father Rosato stopped using 1406 Coolidge Street as a house of worship on or about November 2002.

Avenue. <u>See</u> SMF ¶ 135, 140. The property is zoned multi-family residential, is located on a "moderately traveled roadway," and is bordered by a single-family home to the east and apartments to the south. <u>See id.</u> In 2002, Francis Goode applied for a special exception to permit a place of worship at 725 North 64th Ave for 45 to 50 members. <u>See id.</u> ¶¶ 136, 138. The Planning Division determined that Advent Christian's special-exception application was inconsistent with two of the four special-exception criteria, finding that the proposed use was not "compatible" with the surrounding area and did not provide adequate setbacks, landscaping and general amenities. <u>See id.</u> ¶ 137. Nevertheless, the Planning Division recommended approval, subject to conditions, including a landscape plan. <u>See id.</u> The DRB granted the application, with the condition that the applicant "discuss and receive approval from the City's Landscape Inspector regarding type of hedge material along the northern, southern, and eastern property line as well as 25 foot site triangle at northern corner of property." <u>See id.</u> ¶¶ 138-139. The special exception did not contain any limitation on hours of operation or the number of persons permitted at the property. <u>See id.</u> ¶ 139. No Commissioner appealed. <u>See id.</u> ¶ 141.

Harvest Time Apostolic Church also received a special exception to operate in a residential area. In fact, Harvest Time twice applied for and was twice granted a special exception to operate in a single-family neighborhood. In June 1998, the Church applied for a special exception to use a single-family residence located at 5808 Mayo Street as a place of worship. <u>See id.</u> ¶ 124. The Planning Division found the proposed use to be "compatible," but determined that the application was "inconsistent" with the remaining three special-exception criteria and recommended denial. <u>See id.</u> ¶¶ 125-126. Despite the Planning Division's recommendation, and although the property had a long history of prior code violations, the BAA granted the application, with the condition that the applicant obtain drainage and landscaping permits within 120 days. <u>See id.</u> ¶¶ 127-128. In 2003, the Church applied for another special exception, this time for permission to demolish the existing home at 5808 Mayo Street, and construct a 3,725 square-foot place of worship. <u>See id.</u> ¶ 129. The Planning Division found the 2003 application to be consistent with the special-exception criteria and recommended approval. <u>See id.</u> ¶ 131. Again, the City's professional zoning body, the DRB, approved the application. <u>See id.</u> ¶ 132. The special exception did not contain any limitation on hours of operation or the number of persons permitted at the property. <u>See id.</u> No Commissioner appealed. <u>See id.</u> ¶ 133.

**C.**    <u>Equal Terms: 2427–2431 Taft Street.</u>

In the spring of 2002, an application was made to the City for a special exception to operate a day care center for up to fifty children from three, single-family dwellings at 2427-2431 Taft Street. <u>See</u> SMF ¶ 54. Taft Street is a collector street[22] similar to 46th Avenue. <u>See id.</u> ¶¶ 59-60. Although 2427–31 Taft Street is zoned for low-density, multiple-family use, according to the application and the Planning Director, the properties surrounding 2427 Taft included single-family homes to the north, south, and east, and a duplex to the west. <u>See id.</u> ¶ 55. The application proposed using one of the subject properties as an office, and the remaining two as a day care. <u>Id.</u> ¶ 56. The proposal also included two outdoor play areas. <u>Id.</u> The day care center proposed to operate from 6:30 a.m. to 6:00 p.m. <u>Id.</u> ¶ 57. The city's traffic engineer advised that the day care center would create traffic problems and recommended denying the application. <u>See id.</u> ¶ 61. In fact, in terms of traffic, the day care center could be expected to have a greater impact on the surrounding community than the Chabad. <u>See id.</u> ¶ 64.

The conversion of these homes to a day care center also generated community opposition, including a protest from the local civic association. <u>See id.</u> ¶¶ 65-66. The Planning Division twice reviewed the application, determined that it was inconsistent with three of the four special-exception criteria, and recommended denial. <u>See id.</u> ¶ 67. In particular, the Planning Division found the proposed day care did not meet the criteria requiring compatibility, safe pedestrian and vehicular traffic movement, and adequate setbacks and buffering. <u>Id.</u> Among the Planning Division's concerns were noise and traffic impacts. <u>See id.</u> ¶ 68.

Over the Planning Division's objection, in May 2002, the DRB granted the Taft Street day care center's application with conditions. <u>See</u> SMF ¶ 69. These conditions required the applicant to construct a six-foot fence; to "discuss and receive approval" regarding type of hedge material and add hedges along the east side of the property; and to "work with [the] City Traffic Engineer regarding the circular driveway and entrance/exit along Taft Street." <u>Id.</u> ¶ 70. Operation of the day care center was not made contingent on satisfying any of these conditions, and the conditions did not include any limitations on the number of children that the day care center could serve, or on its hours of operation, or the amount of time during that the outdoor play areas of the property could be used. <u>See id.</u> No Commissioner appealed. <u>See id.</u> ¶ 71.

---

22. According to the City's Planning Director, a collector street is an intermediate street that feeds automobiles from local roads to arterial roads.  Epstein Depo. at 97.

## III.   ARGUMENT

**A.   Summary Judgment Standard.**

Summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Rink v. Cheminova, Inc., 400 F.3d 1286, 1294 (11th Cir. 2005) ("In conducting this inquiry, we construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party.").

**B.   A Section 2(a) Claim is Not an Element of a Claim under Section 2(b)(1) or 2(b)(2).**

The Defendant argues that it is entitled to summary judgment because the United States has not produced evidence that the Chabad's religious exercise has been substantially burdened. The United States has not brought a substantial-burden claim.  Accordingly, the United States is under no obligation to produce evidence that the Chabad has been substantially burdened.

Nothing in the text or history of RLUIPA supports the proposition that the substantial-burden requirement of Section 2(a) is an element of a claim under Section 2(b).  Indeed, the Court of Appeals for the Eleventh Circuit has noted that "[t]he plain terms and structure of RLUIPA indicate that the jurisdictional prerequisites included in [Section 2(a)] . . . do not apply to [Section] b's prohibition on discrimination against and exclusion of religious institutions."[23] Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1229 (11th Cir. 2004); see also Civil

---

23. The Defendant correctly notes that this portion of Midrash is dictum; the Midrash court did not ultimately decide whether the jurisdictional prerequisites of Section 2(a), and therefore the substantial-burden element of those jurisdictional prerequisites, apply to a claim under Section 2(b).  See Midrash Sephardi, Inc., 366 F.3d at 1230.

Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 762 (7th Cir. 2003) (noting that "the substantial burden and nondiscrimination provisions [of RLUIPA] are operatively independent of one another").

The Court of Appeals in Midrash Sephardi, Inc. v. Town of Surfside, set forth three reasons why Sections 2(a) and 2(b) are independent of each other. See 366 F.3d 1214, 1229 (11th Cir. 2004). First, "[Section 2(a)] specifically enumerates three jurisdictional tests . . . while [Section 2(b)] is silent as to jurisdictional tests." Id. Second, "[Section 2(a)], by its terms, applies to 'subsection' (a)." Id. And third, "the jurisdiction limits [of Section 2(a)] relate to burdens imposed by a government—language which is consistent with [Section (a)(1)'s] prohibition on imposing a substantial burden without justification." Id.; see also Ventura County Christian High Sch. v. City of San Buenaventura, 233 F. Supp. 2d 1241, 1247–1250 (C.D. Cal. 2002) (reaching the merits of a plaintiff's Section 2(b)(1) claim where the plaintiff did not bring a Section 2(a) claim).

Midrash and the structure and plain language of RLUIPA notwithstanding, the Defendant argues, based on a selective reading of the legislative history of RLUIPA and on three district court opinions from outside this Circuit, that a substantial burden must be an element of a Section 2(b) claim. Both arguments are unpersuasive. The City suggests, for example, that the following language from the legislative history of RLUIPA supports the conclusion that proof of a substantial burden on religious exercise is necessary to support a claim of discrimination on the basis of religion: "the party asserting a violation of this Act shall in all cases bear the burden of proof that the government action in question constitutes a substantial burden on religious exercise." See 146 Cong. Rec. S7774, S7776 (July 27, 2000). This language is not dispositive. When read in context, it is clear it refers not to the elements of a claim under Section 2(b) as the City suggests, but to Section 4(b) of the Act, which governs the locus of the burden of persuasion for a claim under Section 2.[24]

_____

24. Section 4(b) provides:

   If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

-12-

The district court cases that the City cites are equally unpersuasive. First, none of the cases Defendant cites are from this Circuit. It is the reasoning of <u>Midrash</u>, and not the cases upon which Defendant relies, that should control here. Indeed, <u>Lighthouse Inst. for Evangelism Inc.</u> v. <u>Long Branch</u>, 406 F. Supp. 2d 507, 516 (D. N.J. 2005),[25] expressly rejects both the Eleventh Circuit's analysis of the relationship between Sections 2(a) and (b), and the <u>Midrash</u> court's holding with respect to Section 2(b)(1). <u>See id.</u> at 518–519. Second, these cases misapprehend the purpose of Section 2(b). Thus, <u>Lighthouse Inst. for Evangelism Inc.</u> notes that the Eleventh Circuit's "analysis of [S]ection (b) [ ] creates a standard that improperly replaces the constitutional test for equal protection." <u>Id.</u> This view ignores the fact that RLUIPA represents a prophylactic remedy designed "to simplify the enforcement of constitutional standards." <u>See</u> Joint Statement at S7775.

Also unpersuasive is <u>Vineyard Christian Fellowship of Evanston, Inc.</u>, v. <u>City of Evanston</u>, 250 F. Supp. 2d 961 (N.D. Ill. 2003). There, invoking the doctrine of constitutional avoidance, the court relied on the absence of a standard of review in Section 2(b), and construed Section 2(b) as a subset of Section 2(a) to avoid reading Section 2(b) as imposing strict liability. <u>Id.</u> at 992–993. The issue of constitutional avoidance raised by the <u>Vineyard</u> court, however, is a manufactured one. Section 2(b), in codifying Supreme Court free-exercise jurisprudence, contains a standard of review: strict scrutiny. <u>See Midrash</u>, 366 F.3d at 1232 ("[A] violation of § (b)'s equal treatment provision, consistent with the analysis employed in <u>Lukumi</u>, must undergo strict scrutiny."). Accordingly, the absence of an express standard of review in Section 2(b) does not mandate reading 2(b) as a subset of 2(a). Finally, none of the cases Defendant cites address the fact that to read a substantial-burden requirement into Section 2(b) would be inconsistent with the Free Exercise Clause prohibition on intentional religious discrimination. <u>See Church of the Lukumi Babalu Aye, Inc.</u> v. <u>City of Hialeah</u>, 508 U.S. 520, 532 (1993).

Indeed, to read a substantial-burden requirement into Section 2(b) would be to take

---

42 U.S.C. § 2000cc–2(b).

25. Defendant also cites <u>Freedom Bapt. Church of Del.</u> v. <u>Township of Middletown</u>, 204 F. Supp. 2d 857 (E.D. Pa. 2002), in support of its argument that a showing of a substantial burden is an element of a claim under § 2(b). <u>Freedom Baptist Church of Del.</u>, however, does not address this point, and the portion of the opinion on which Defendant relies is dictum. <u>See id.</u> at 860 (addressing only the issue of the constitutionality of RLUIPA).

governmental acts that intentionally discriminate on the basis of religion, but that do not *substantially* burden religious exercise, outside the scope of RLUIPA. In other words, RLUIPA would no longer prohibit governmental action that discriminates on the basis of religion, provided that the local government discriminated in such a way that did not impose a substantial burden on religious exercise. Such a construction is inconsistent with both Congress's stated intention that RLUIPA be interpreted to provide "broad protection of religious exercise," see 42 U.S.C. § 2000cc–3(e), and with judicial decisions consistently holding that RLUIPA codifies free-exercise jurisprudence, see Cutter v. Wilkinson, 125 S. Ct. 2113, 2117 (2005) ("RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens consistent with this Court's precedents."), a jurisprudence that clearly establishes that the Free Exercise Clause prohibits intentional religious discrimination regardless whether such discrimination results in a substantial burden on religion. See, e.g., Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 532 (noting that "the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.").

The United States is not required to plead that Defendant substantially burdened the Chabad's religious exercise to state a claim under either Section 2(b)(1) or 2(b)(2), nor is the United States required to produce evidence that the Chabad has been substantially burdened.[26] The absence of such evidence, therefore, cannot support a motion for summary judgment.[27]

C.  **Summary Judgment Should Not be Granted to the Defendant on the United States' Equal Terms Claim.**

  1.  **Defendant misstates the standard to be applied to an equal terms claim, and unreasonably narrows the category of assemblies or institutions that are relevant to a determination under Section 2(b)(1).**

The Defendant further argues that it is entitled to summary judgment on the United States' equal terms claim because there is no evidence of a "similarly situated" assembly or institution that the City treated differently than the Chabad. The Defendant is wrong.

---

26.  Furthermore, there is evidence that the Chabad has been substantially burdened by the City's actions. See SMF ¶¶ 80, 87-98.

27.  In any event, the undisputed evidence establishes that the jurisdictional prerequisites of Section 2(a) are met here. The City engaged in an individualized assessment of the Chabad's land use before denying the Chabad's special-exception application. See SMF ¶¶ 1–5, 17.

The Eleventh Circuit has twice discussed what constitutes an appropriate comparable use in the context of Section 2(b)(1).  See Konikov v. Orange County, 410 F.3d 1317, 1324 (11th Cir. 2005); Midrash, 366 F.3d at 1230.  In Midrash, the Court of Appeals emphasized that "Section (b)(1) makes it clear that the relevant 'natural perimeter' for consideration with respect to RLUIPA's prohibition is the category of 'assemblies or institutions,'" and that under RLUIPA, the first evaluation must be whether an entity qualifies as an "assembly or institution."  Midrash, 366 F.3d at 1230; see also Konikov, 410 F.3d at 1324 (holding that under RLUIPA, the standard is not whether one use is "similarly situated" to another in the "familiar equal protection jurisprudence," but "whether the land use regulation or its enforcement treats religious assemblies and institutions on less than equal terms with nonreligious assemblies and institutions").  Traditional equal-protection considerations also are relevant under Section 2(b)(1).  Thus, in Konikov, the court stated that determining whether a zoning code had been implemented in a manner that violated 2(b)(1), required "a thorough review of the record, examining the evidence considered" by the governmental body in question, including such things as frequency of use, the number of people and vehicles, and whether the two situations have a "comparable impact" on the community.  410 F.3d at 1327.

The Defendant has pointed the Court instead to Campbell v. Rainbow City, 434 F.3d 1306 (11th Cir. 2006), an equal-protection case, arguing that the Campbell court's definition of "similarly situated" should control because the case involved zoning.  See Def's Memo. of Law at 9 n.5.  Specifically, the Defendant points to Campbell's holding that "in order for any development to be similarly situated to Plaintiffs' proposed project, it must be *prima facie* identical in all relevant respects."  Campbell, 434 F.3d at 1314.  However, the Defendant's reliance on Campbell  because it is a zoning case, rather than Midrash and Konikov, overlooks the obvious: Both Midrash and Konikov also were zoning cases, but additionally and more specifically, challenges to zoning provisions under RLUIPA.  In any event, the Defendant's reliance on the court's definition of "similarly situated" in Campbell begs the question of what the "relevant" aspects of two proposed uses are in determining whether they are similarly situated.  Konikov provides more relevant insight into that issue.  Moreover, the Defendant's argument that the uses must be identical in all respects is belied by the fact that Section 2(b)(1) itself contemplates that religious assemblies on the one hand are compared to something

-15-

different, namely non-religious assemblies.

As in <u>Konikov</u>, whether Defendant treated the Chabad on less than equal terms requires a "thorough review of the record" including an examination of the evidence that was actually considered by the City. <u>Cf.</u> <u>Konikov</u>, 410 F.3d at 1327. An important corollary is that any analysis of whether properties are comparable under RLUIPA should consider the framework under which the City evaluates special-exception applications. The City established a mechanism by which special-exception applications are evaluated, including specific criteria to be applied to those applications. <u>See</u> ZLDR at § 5.3(G)(1). These are the factors the City has determined to be relevant, and are the factors that should be considered here.

Finally, the Defendant claims that the United States has failed to identify properties that were treated on less than equal terms than the Chabad.[28] But the day care center located at 2427–31 Taft Street, the property of Rosa Lopez, and the day care located at 5608 Taft Street are all similarly situated to the Chabad in light of the analysis applied in <u>Midrash</u> and <u>Konikov</u>.

   **2.    There are disputed facts regarding whether the day care facility located at 2427-2431 Taft Street is comparable to the Hollywood Community Synagogue.**

Defendant overlooks a dispute of material fact regarding 2427-31 Taft St. and fails to consider the impact of the day care at 2427–31 Taft St. Although Defendant concedes that this Court must consider whether the uses of the Taft Street day care and the Chabad have a "comparable community impact," it ignores the impact that its own Planning Department concluded that the day care has on surrounding properties. Rather, Defendant rests its argument on the fact that 2427 Taft Street is zoned for multi-family use, while the Chabad is zoned for single-family use. The differential zoning designation is not determinative under the City's special-exception application process. Even Defendant's expert acknowledged that simply knowing that the Taft Street properties are zoned multi-family and the Chabad's properties are zoned single-family is not enough to determine which use would have more of an impact on its neighbors.[29]

---

28. The Defendant does not argue that the City's treatment of these properties, should the Court deem them appropriate comparables, has been on equal terms to the City's treatment of the Chabad.

29. Deposition of C. Cutro at 285-286.

-16-

Moreover, the zoning code measures all special-exception applications by the same criteria, regardless whether the use is proposed for a single- or multi-family residential zone. Compare ZLDR § 4.1(A), with § 4.2(A). Thus, while zoning designations are relevant, they are not determinative. Furthermore, this distinction overlooks both the impact of each use and the evidence the City considered when it evaluated the two applications. The special-exception application to operate a day care center at 2427-31 Taft Street called for the conversion of three single-family homes surrounded by residential properties and other single-family homes. The Planning Division had concerns about noise and traffic, concerns that were in some respects more significant in the case of the day care than the Chabad. The Planning Division also determined that the proposed use of the properties was "not compatible" with the neighborhood and that the application failed to meet three of the four special exception criteria.

The different zoning designations notwithstanding, there is ample evidence to support the conclusion that the impact of 2427-31 Taft is comparable to, if not a greater than the Chabad's impact. Thus, although the Defendant repeatedly references a "future land use plan" calling for "a density of 11-16 units per acre," the day care center's properties were surrounded at the time of their application by single family homes and duplexes. It is with respect to these properties, not hypothetical future land uses, that the City measured the impact of the proposed use.

Despite the Defendant's insistence that "[v]ery different planning and zoning considerations governed" the two uses, the City's code, testimony of the City's Planning Director and the report prepared by the Planning Department at the time of the day care's application tell a different story. The Defendant's failure to distinguish these properties is further evidenced by what it identifies as "the most critical factor that makes the daycare and Chabad not similarly situated . . . future land use plans," by which Defendant apparently means the allowable upper limit on development in the applicable zoning area. No one, however—not the City's decision-makers nor its Planning Director—has ever indicated that "future land use plans" played any role in the consideration of the proposed uses. Not surprisingly, the City, rather than pointing to any evidence, simply asserts that "[b]y no stretch of the imagination" could the two properties be deemed comparable. See Def's Memo. of Law at 15. In fact, as evidenced by the Planning Director's testimony, it takes little stretching of the imagination to see how comparable are the impacts of the two properties.

Finally, there are disputed material facts regarding 2427-31 Taft Street. The parties

dispute whether the existing use of the properties at the time of application was as multiple-family duplexes or as single family homes.  See Stmt. of Material Facts in Dispute ¶ 32.  And, the United States' rebuttal expert has concluded, contrary to the City's position, that 2427–31 Taft Street and the Chabad are comparable.  See id. ¶ 72.

### 3. Even if Rosa Lopez is not operating a "religious institution," she is operating an "assembly" compared to which the Hollywood Community Synagogue has been treated on less than equal terms.

Defendant also claims that "[t]he uses of property at the Chabad and at the home of Rosa Lopez are so incomparable that they could never be said to be 'similarly situated' to one another." Def's Memo. of Law at 22. This argument is wrong on the facts and misleading in its implications.

It is important to note two things at the outset in comparing the Chabad to the Lopez property.  First, it is undisputed that Rosa Lopez has been treated differently than the Chabad; the City has never required Rosa Lopez to apply for a special exception.  Second, any analysis of the Lopez property begins from a different point than the analysis of the day care discussed above. In the case of Rosa Lopez, the Defendant has taken the position that the activities that occur at the home of Ms. Lopez do not require a special exception because she is not operating a "house of worship" within the meaning of the City's zoning code.[30]  See Section III(D)(1), infra.  Indeed, the Defendant's expert has gone so far as to say that the "zoning laws do not apply in her case."[31]

Even if the City did decide that Rosa Lopez was not operating a house of worship within the meaning of the City's code, however, that does not address whether the regular activities that occur at the Lopez home constitute a nonreligious assembly or institution such that the City may be held to have treated the Chabad on less than equal terms than Rosa Lopez.  The threshold question is whether the use of the Lopez property falls within RLUIPA's "'natural perimeter,'" see Midrash, 366 F.3d at 1230, in other words, whether the Lopez property is used by an "assembly or institution" against which the Chabad may be compared.

The use of the Lopez property falls within the Eleventh Circuit's definition of

---

30. Whether the City ever made such a determination is a disputed issue of material fact. See Part III(D)(1), infra.

31. See SMF at ¶ 52; see also Cutro Expert Report.

"assembly." See 366 F.3d at 1230. The activities at the property include groups of persons coming together, often in an organized fashion, for the purposes of prayer and receiving healing benefits. By treating the assembly use that occurs at the Lopez property as one that does not require any type of application to, and approval from the City, while requiring such application and approval by the Chabad, the City has treated the Chabad on less than equal terms than Rosa Lopez and the Loving Mother's Foundation.

More important, as discussed in detail below, see Part II(D)(2), infra, there are material facts in dispute regarding the activity that takes place at Rosa Lopez's property.

### 4. The day care facility located at 5608-12 Taft Street has been treated more favorably than the Hollywood Community Synagogue.

Finally, the Defendant ignores another comparable use. In 1997, the City of Hollywood approved an application for a special exception to allow the expansion of the Just for Kids day care, located in a residential district, from 38 to 64 children. See SMF ¶ 73. The day care operates from converted single-family homes and has an impact on the community comparable to the Chabad. See id. ¶¶ 74–76.

### D. Summary Judgment Should Not be Granted to Defendant on the United States' Discrimination Claim.

The City also maintains that summary judgment is appropriate because there are no disputed material facts indicating that the home of Rosa Lopez or the Apostolic Christian Church located at 1713 Dewey Street are "religious institutions"[32] similar to the Chabad. The City's argument, however, misapprehends the relevance of these properties, overlooks disputes of fact regarding these properties, and ignores evidence that the City's denial of the Chabad's special-exception application was made on the basis of the Chabad's religious denomination.

### 1. Rosa Lopez and the Catholic Church in America were treated more favorably than the Hollywood Community Synagogue.

As noted above, unlike the Chabad, neither Rosa Lopez nor the Catholic Church in America ("CCA") was required to apply for a special exception. The City, of course, attempts to distinguish Rosa Lopez from the Chabad. The gravamen of the City's argument with respect to

---

32. An "institution" within the meaning of RLUIPA is defined as "[a] group of persons organized and united for some common purpose" or "an established society or corporation: an establishment or foundation esp. of a public character." See Midrash, 366 F.3d at 1230 (internal citations omitted).

Rosa Lopez is that the primary use of the Lopez home is residential, that Ms. Lopez is therefore not operating a "house of worship" within the meaning of the City's zoning code, and that she cannot be considered similarly situated to the Chabad. This argument is flawed for three reasons.

First, the City's reliance on the claim that the "primary" use of the Lopez home is residential is a red herring. The issue is not the primary use of the Lopez home, but whether Rosa Lopez operates a "religious institution" and was treated differently than the Chabad. See Midrash, 366 F.3d at 1230. The Chabad was required to apply for, then denied a special exception; Rosa Lopez was never required to apply for a special exception. The City's argument is also grounded in the assumption that the City actually determined that Ms. Lopez was not required to apply for a special exception. That assumption is disputed. The Mayor, who has sat on the Commission since before 1994, testified that the City never made a formal determination regarding the use of the Lopez property. See SMF ¶ 30. To the extent any binding determination was made, it was that Ms. Lopez was operating a house of worship and should apply for a special exception. Making such determinations is primarily the responsibility of the Planning Department, and the undisputed evidence shows that in 1995 the Planning Department determined that Ms. Lopez was operating a house of worship.[33] See SMF ¶ 27. The City never acted on that determination. Indeed, the current Planning Director was specifically directed by the City Attorney not to visit the Lopez home. See SMF ¶ 53.

Second, assuming *arguendo* that the City did decide that Rosa Lopez was not operating a house of worship within the meaning of the City's code, there is still evidence that the City treated Ms. Lopez differently than the Chabad. The City's code requires property owners in single-family districts to apply to the Planning Director for permission before engaging in "other accessory uses," or uses that are not "customarily associated with single family homes." See SMF ¶ 9. The Planning Director testified that regularly hosting large gatherings of people, broadcasting prayers, and selling religious items are uses not customarily associated with single-family homes. See id. ¶ 12. Nevertheless, Rosa Lopez has never been required to apply to the Planning Director in connection with any of the activities that take place at her home.

---

33. Furthermore, the Commissioner whose district actually embraces the Lopez home has described what occurs there as a "religious assembly." See SMF ¶ 28.

Third, there are disputed issues of material fact regarding the use of the Lopez home and the extent to which it is comparable to the Chabad. The City asserts that religious gatherings take place only once a month at the home of Rosa Lopez. The evidence, however, shows that religious gatherings also occur at the Lopez home on days other than the 13th of the month. See SMF ¶ 42. Furthermore, the evidence shows that a non-profit organization operates from the home, invites the public to the home by means of a website and newsletter, staffs the Apparition Room at the home with a "volunteer," and sells religious articles from the property. See id. ¶¶ 43-48. These facts are material and preclude summary judgment in favor of the City.

Finally, the Catholic Church in America ("CCA") also received more favorable treatment than the Chabad, a fact absent from the City's motion. Like the Chabad, the CCA operated from a single-family home surrounded by other single-family homes. The owners of both properties undertook renovations to make the properties suitable for religious gatherings. And both properties came to the City's attention. Unlike the Chabad, however, the CCA was never required to apply for a special exception. The City does not—and cannot—explain away this differential treatment.

### 2. The City subjected Hollywood Community Synagogue to different treatment than other special exception applicants.

The City also argues that the Apostolic Christian Church ("ACC") cannot be considered similarly situated to the Chabad. This argument, however, overlooks disputed issues of fact concerning ACC and disregards evidence, independent of whether ACC is comparable to the Chabad, that supports a finding of liability on the United States' discrimination claim, including (1) evidence that the Chabad was subjected to procedural barriers and conditions that no other property faced; and (2) evidence that the City's decision to deny the Chabad a special exception was made on the basis of the Chabad's religious denomination.

As demonstrated above with respect to 2427–31 Taft Street, whether two comparable properties are similar and have similar impacts is a fact-sensitive inquiry not susceptible to summary judgment. Indeed, whether ACC and the Chabad are even comparable is in dispute. According to the United States' rebuttal expert, the two are comparable. See SMF ¶ 115.

More important, in focusing on whether two properties are similarly situated, the City overlooks the true import of ACC and other properties to this matter, namely, that in subjecting

-21-

ACC and other properties to different standards and procedures than it subjected the Chabad, the City discriminated against the Chabad on the basis of its religious denomination. As noted above, there is evidence that other properties that received special exceptions were either never required to appear before the City Commission, received special exceptions despite having failed to satisfy all of the special-exception criteria, or received special exceptions that did not contain any conditions comparable to the ones imposed on the Chabad. ACC, St. Mark's Lutheran, Advent Christian Cathedral, and Harvest Time Apostolic Church all received more favorable treatment than the Chabad.

All four churches were located in residential areas, yet no Commissioner appealed the DRB or BAA decisions granting them special exceptions. St. Mark's Lutheran and Harvest Time Apostolic Church, unlike the Chabad, both received special exceptions, without fanfare, to use single-family homes for religious worship. Indeed, St. Mark's property, like the Chabad, is located in a single-family district and is surrounded by single-family homes. St. Mark's received a special exception; the Chabad did not.

The City's treatment of Harvest Time Apostolic Church and Advent Christian Cathedral is also illustrative. The Planning Commission recommended that the zoning board deny the Chabad's, Harvest Time Apostolic's, and Advent Christian Cathedral's applications on the grounds that all three were inconsistent with the special-exception criteria. The professional zoning board granted all three. Only with the Chabad, however, did a Commissioner appeal, with the result that the Chabad's was the only application that was denied. Only the Chabad received a special exception that was limited for one year. Only the Chabad was required to limit the number of persons who could attend services at its property. No similar condition was placed on a special exception granted to any other religious institution.

### 3. The City denied the Hollywood Community Synagogue a special exception on the basis of religious denomination.

Finally, even absent these properties there is sufficient evidence that the Chabad was the victim of religious discrimination. Indeed, the City's focus on the existence *vel non* of properties similarly situated to the Chabad presumes that the United States must show that the City treated other religious institutions differently than the Chabad to prevail on its Section 2(b)(2) claim.

-22-

That premise is false.  A claim of discrimination does not require a showing of disparate treatment.  See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 n.14 (1977) ("A single invidiously discriminatory governmental act in the exercise of the zoning power as elsewhere would not necessarily be immunized [under the Equal Protection Clause] by the absence of such discrimination in the making of other comparable decisions."); see also Batson v. Kentucky, 476 U.S. 79, 95 (1986) (same); Fleming v. Kemp, 794 F.2d 1478, 1483 (11th Cir. 1986) (same).[34]  Rather, the United States may prevail under Section 2(b)(2) by establishing that the City denied the Chabad's permit based, at least in part, on an impermissible religious motivation.  See Midrash, 366 F.3d at 1238 (noting that discrimination on the basis of religion violates the Free Exercise and Establishment Clauses (citing Lukumi, 508 U.S. at 534)); cf. Arlington Heights, 429 U.S. at 266.  Moreover, such a claim of discrimination on the part of a legislative body involves a sensitive factual inquiry into the reasons for the City's actions and is not susceptible to summary judgment.  See Hunt v. Cromartie, 526 U.S. 541, 552, 552 n.9 (1999) (reversing summary judgment in an equal protection case where "[t]he legislature's motivation is itself a factual question," and noting that summary judgment is rarely granted where a defendant's racial motivation is at issue).

As described in Section I, above, there is substantial evidence that the City denied the Chabad's special-exception application on the basis of religion.  Other that the Chabad's application, the City has never denied a request by a place of worship to operate in a single-family or multiple-family residential zone.  Cf. Lukumi, 508 U.S. at 534.  Furthermore, the City denied the Chabad's application under circumstances that support an inference of discriminatory intent.  See Arlington Heights, 429 U.S. at 266 ("Sometimes a clear pattern [of discrimination], unexplainable on grounds other than [religion] emerges from the effect of the state action even

_____

34.  This line of cases differs from equal protection claims brought by persons who, unlike the Chabad, do not allege discrimination on the basis of membership in a protected class.  Where, unlike here, a plaintiff is not a member of a protected class, the Equal Protection Clause may still be implicated; the plaintiff, however, must "allege[ ] that she has been treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1314 (11th Cir. 2006) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

when the governing legislation appears neutral on its face.").[35]  The City's September 12, 2001, decision to require the Chabad to relocate came after a meeting that lasted through the night, and that was tainted by discriminatory slurs from the crowd and by comments from a City Commissioner that evince religious bias.  Cf. id. at 267.  Four Commissioners described the Chabad's application as controversial, and one Commissioner stated that the controversy surrounding the Chabad was the basis for the City's actions.  See SMF ¶ 86.  Furthermore, the irregular nature of the City's decision, made without notice to the public or the Chabad, to enjoin the use of the Chabad's property for religious worship also supports an inference of discrimination.  See Arlington Heights, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

The City's treatment of the Chabad after September 12, 2001, also supports an inference of discriminatory intent.  No other property comparable to the Chabad was subjected to the level of code enforcement and police attention that the Chabad received when, after September 2001, code enforcement and police officers began visiting the Chabad on a daily basis.  Moreover, it is undisputed (1) that the same types of violations that were the subject of daily code enforcement visits at the Chabad went unpunished at Christian houses of worship in Hollywood Hills, including at Nativity Church—the Church that Commissioner Oliveri, the City Manager, and numerous members of the Police Department attend—and (2) that the City was aware that code violations went unpunished at other properties.  See SMF ¶¶ 100-104.  Such conduct supports a finding of discriminatory intent.  See, e.g., United States v. Lichenstein, 610 F.2d 1272, 1281 (5th Cir. 1980) (selective enforcement requires a showing "(1) that others similarly situated have not generally been prosecuted and (2) that the government's discriminatory selection . . . is based on constitutionally impermissible considerations such as race or religion."); see also Campbell, 434 F.3d at 1314.

---

35.  "[W]here a stark pattern of discrimination is not evident, the courts should consider circumstantial evidence, which includes . . . : (1) historical background of the decision, (2) the specific sequence of events leading up to the challenged decision, (3) departures from the normal procedural sequence, as well as substantive departures, and (4) legislative or administrative history." Jean v. Nelson, 711 F.2d 1455, 1485–86 (11th Cir. 1983), rev'd, in part, en banc, 727 F.2d 957 (11th Cir. 1984).

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Defendant's motion be denied in its entirety.

Respectfully submitted this ____*11*ᵗʰ____ day of ____*April*____, 2006,

R. ALEXANDER ACOSTA
United States Attorney

WAN J. KIM
Assistant Attorney General
Civil Rights Division


MARILYNN LINDSEY
Assistant U.S. Attorney
500 E. Broward Blvd
Ft. Lauderdale, Fl. 33394
Florida Bar No.
Tel: (954) 356-7255
Fax: (954) 356-7336
E-mail: Marilynn.Lindsey@usdoj.gov

STEVEN H. ROSENBAUM , Chief
MICHAEL S. MAURER, Deputy Chief
SEAN KEVENEY, Trial Attorney
R. TAMAR HAGLER, Trial Attorney
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., G Street
Washington, D.C. 20530
Tel: (202) 514-4838; Fax: (202) 514-1116
E-mail: Sean.R.Keveney@usdoj.gov