**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. 04-61212 (CIV–Lenard/Klein)

United States,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )
                                  )
City of Hollywood, Florida,       )
                                  )
            Defendant.            )

**NIGHT BOX**
**FILED**

APR 1 2 2006

CLARENCE MADDOX
CLERK USDC / SDFL / MIA

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF THE UNITED**
**STATES' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    STATEMENT OF MATERIAL FACTS IN DISPUTE ........................ -1-

II.   STATEMENT OF ADDITIONAL MATERIAL FACTS ...................... -4-

      A. Jurisdiction ...................................................... -4-
      B. City of Hollywood ............................................... -4-
           1. City Government & Zoning Code ............................ -4-
           2. Hollywood Hills ......................................... -5-
      C. Equal Terms .................................................... -5-
           1. The Chabad .............................................. -5-
           2. Rosa Lopez .............................................. -6-
           3. 2427–31 Taft Street Day Care ............................ -9-
           4. 5608–12 Taft Street Day Care ............................ -11-
      D. Discrimination ................................................. -11-
           1. Intent to Discriminate on the Basis of Religion. ........ -11-
           2. Disparate Treatment. .................................... -14-
                a. Selective enforcement. ............................. -14-
                b. 1713 Dewey Street (Apostolic Christian Church). ..... -15-
                c. 1406 Coolidge Street (Catholic Church in America) ... -15-
                d. 5808 Mayo Street (Harvest Time Apostolic Church). ... -16-
                e. 725 N. 64th Ave. (Advent Christian Cathedral) ....... -18-
                f. 502 N. 28th Ave. (St. Mark's Lutheran Church) ....... -19-

## I. STATEMENT OF MATERIAL FACTS IN DISPUTE

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Disputed.  The Chabad's president, Arthur Eckstein testified. "There's been times when we were not able to get ten men to hold a minyan." Eckstein Depo. at 181.

5.    Undisputed.

6.    Undisputed.

7.    Undisputed.

8.    Undisputed.

9.    Undisputed.

10.    Undisputed.

11.    Undisputed.

12.    Undisputed.

13.    Undisputed.

14.    Undisputed.

15.    Undisputed.

16.    Undisputed.

17.    Undisputed.

18.    Undisputed.

19.    Undisputed.

20.    Undisputed.

21.    Undisputed.

22.    Undisputed.

23.    Disputed.  It is undisputed only that Ms. O'Sheehan testified that she has been disturbed in her home by the Chabad.  Furthermore, Ms. O'Sheehan was not in her home for an entire year that the Chabad was in operation. See O'Sheehan Depo. at 12–13.

24.    Disputed.  It is undisputed only that Ms. O'Sheehan testified that she has been awoken at 11:45 p.m. by children at the Chabad.  Furthermore, Ms. O'Sheehan was not in her home for an entire year that the Chabad was in operation. See O'Sheehan Depo. at 12–13.

25. Disputed. Ms. O'Sheehan testified that she is disturbed by noise from the Chabad on a monthly basis. Whether loud noises escape the Chabad's property after 11:00 p.m. is disputed. See Declaration of Rabbi Korf.

26. Disputed. Ms. O'Sheehan has testified that she has difficulty putting her children to sleep at night because of noises coming from the Chabad. Whether loud noises regularly escape the Chabad's property after 11:00 p.m. is disputed. See Declaration of Rabbi Korf.

27. Disputed. There were fewer than 129 people at the Chabad on the morning of March 8, 2003. See City of Hollywood Police Report at FLA0030247.

28. Disputed. It is undisputed only that Ms. Petrillo testified that she has heard noise coming from the Chabad as late as 2:00 a.m. on at least one occasion. See Petrillo Depo. at 38. Ms. Petrillo could not remember whether she has heard noise coming from the Chabad after 2:00 a.m. on more than five occasions. Furthermore, whether loud noises regularly escape the Chabad's property after 11:00 p.m. is disputed. See Declaration of Rabbi Korf.

29. Disputed. It is undisputed only that Ms. Petrillo testified that she has had difficulty putting her son to bed on more than ten occasions because of noise coming from the Chabad. Whether loud noises regularly escape the Chabad's property is disputed. See Declaration of Rabbi Korf.

30. Disputed. It is undisputed that no member of the Chabad has told Rabbi Korf that "something the City has or has not done forced them to forgo their religious beliefs." See Korf Depo. at 149. Rabbi Korf, however, also testified that the City's actions may have forced a member of the Chabad to "forgo [his] religious beliefs." See id. at 148:22–149:4.

31. Undisputed.

32. Disputed. At the time of its special-exception application 24217–31 Taft Street was surrounded by single-family homes to the north, south, and east, and a multi-family duplex to the west. See FLA0020065. The existing use on the property at the time was not "multi-family duplexes," but three single-family homes. See Defendant's First Supplemental Response to Plaintiff's Fourth Set of Requests for Admission at 1.

33. Undisputed.

34. Undisputed.

-2-

35.    Undisputed.

36.    Disputed.  According to the City of Hollywood Zoning and Land Use Regulations ("ZLDR" of "zoning code") houses of worship are considered "generally suitable" for single-family districts.  See ZLDR § 5.3(G).

37.    Undisputed.

38.    Undisputed.

39.    Undisputed.

40.    Disputed.  Religious gatherings take place at the Lopez home on the 13th of each month, and on days other than the 13th of the month.  See Schmitzer Declaration; Chung Declaration at 1–2.  The Lopez home is also open to visitors and religious pilgrims on days other than the 13th of the month.  See Schmitzer Declaration; Chung Declaration at 1–2.  And a sign indicating hours during which the Lopez home is open each day to the public is also posted on the home.  See Chung Declaration at 2.

41.    Undisputed.

42.    Undisputed.

43.    Undisputed.

44.    Undisputed.

45.    Undisputed.

46.    Undisputed that it is the City's position, based on an affidavit of an expert witness retained for this case, that it is not aware of any gatherings that occur at the Lopez home on Sundays.

47.    Disputed.  A seven-foot-tall crucifix, a six-foot-tall fountain, and religious statues, all of which constitute architectural alterations, have been installed at the home of Rosa Lopez located at 1301 N. 66th Ave.  See Declaration of Evan Chung at 2.  A sign indicating hours during which the home is open to the public has also been installed.  See id. at 2.

48.    Disputed.  Officer Hernandez did not "monitor" the Lopez home on weekdays.  He drove by the home twice a day since April 2005.  See Hernandez Depo. at 16, 21-23, 36-37.

49.    Undisputed only that Officer Hernandez so testified.

50.    Undisputed only that Lieutenant Roberts so testified.

51.    Undisputed.

52.   Undisputed.

53.   Undisputed.

54.   Undisputed.

55.   Undisputed.

56.   Undisputed.

57.   Undisputed.

II.   **STATEMENT OF ADDITIONAL MATERIAL FACTS**

   **A. Jurisdiction**

1.   The City of Hollywood is a "government" within the meaning of Section 2(b)(1) and (2)(b)(2) of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). See Second Set of Requests for Admission at 1–2.

2.   The City of Hollywood Zoning and Land Use Regulations ("ZLDR") are "land use regulations" within the meaning of RLUIPA. See id.

3.   The Hollywood Community Synagogue ("HCS" or "the Chabad") is a "religious assembly or institution" within the meaning of RLUIPA. See id. at 2–3.

4.   In denying HCS a special exception to operate a house of worship at 2215 and 2221 North 46th Ave. the City imposed or implemented a land use regulation within the meaning of Section (2)(b)(1) and 2(b)(2) of RLUIPA. See id. at 4–5.

5.   The City held an evidentiary hearing to determine whether HCS is "compatible with the existing natural environment and other properties within the vicinity," see ZLDR § 5.2(G); see also Transcript of Sept. 12, 2001 meeting.

   **B. City of Hollywood**

      **1. City Government & Zoning Code**

6.   The City of Hollywood has a City Manager and a seven-member City Commission. The Mayor presides over the City Commission. See Giulianti Depo. at 27–28. Executive authority rests with the City Manager. See Giulianti Depo. at 27; Benson Depo. at 23–24 (describing the City Manager as the "chief executive officer" of the City).

7.   The City of Hollywood maintains an Office of Planning, which employs a planning director, two principal planners, and three associate planners. See Epstein Depo. at 47.

-4-

Jaye Epstein is the director of the Office of Planning.  See id. at 22.

8.      The ZLRD permits accessory uses that are "customarily associated with single family homes" to occur in single-family districts without the need for a variance, special exception, or other zoning permit.  See ZLDR § 4.1(A).

9.      The ZLDR provides that accessory uses that are not "customarily associated with single family homes" may be conducted in a single-family neighborhood only with the approval of the Planning Director.  See ZLDR § 4.1(E).

10.     The City, pursuant to the South Florida Building Code, imposes different requirements, including provisions relating to handicapped-accessible bathrooms, on "assembly uses" than "residential uses."  See Exhibit 35; see also Gonzales Depo. at 160–61.

11.     According to the City Manager, the Office of Planning, or in some circumstances the Office of Planning in conjunction with the Office of Building and Engineering Services, is responsible for determining whether a property owner should apply for a special exception.  See Benson Depo. at 87, 92; Oliveri Depo. at 53.

12.     The City's current Planning Director testified that regularly hosting large gatherings of people, broadcasting prayers, and selling religious items are uses that are not customarily associated with single-family homes.  See Epstein Depo. vol. 2 at 383.

### 2. Hollywood Hills

13.     Hollywood Hills is bounded by Sheridan Street to the north, Washington Street to the south, Park Road to the east, and 56th Avenue to the west.  See Oliveri Depo. at 7.

14.     Sal Oliveri is the City Commissioner who represents Hollywood Hills.  See Oliveri Depo. at 7.

15.     The Orthodox Jewish population in Hollywood is concentrated north of Sheridan Street in a neighborhood known as Emerald Hills, and in the Harbor Islands located in southeastern Hollywood.  See Wasserstrom Depo. at 50; Anderson Depo. at 136.

16.     Prior to HCS's opening, there were no Orthodox synagogues, nor any concentrations of Orthodox Jews, in Hollywood Hills.  See Wasserstrom Depo. at 50–51.

### C. Equal Terms

### 1. The Chabad

17.     The City required HCS to apply for a special exception.  See Gonzales Depo. at 66–67,

70.

18. On February 14, 2001, HCS applied for a special exception to operate from 2215 and 2221 N. 46th Ave., two, single-family homes in Hollywood Hills. See 002162.

19. On May 10, 2001, the Board of Adjustment and Appeals ("BAA") granted HCS a special exception; Commissioner Oliveri appealed the BAA's decision. See Oliveri Depo. 115.

20. HCS's property is separated from an intensive commercial district by only one single-family residence. See Weinstein Declaration at 3.

21. North 46th Avenue is a heavily traveled collector street. See Epstein Depo. at 194; Ramirez Depo. at 215.

22. True and accurate photographs of 2215 and 2221 N. 46th Avenue are attached as Exhibits 1 and 2 to the declaration of Evan Chung.

### 2. Rosa Lopez

23. Since the early 1990s Rosa Lopez, who lives at 1301 N. 66th Ave., Hollywood, Florida, has claimed to receive apparitions of the Virgin Mary. See Russo Depo. at 7.

24. Since 1994, people have gathered each month at Ms. Lopez's home for religious services and to hear Ms. Lopez deliver a message from the Virgin Mary. See First Set of Requests for Admission at 1–2; Cole Depo. at 47, 53–54; Declaration of Evan Chung at 1–4.

25. 1301 N. 66th Avenue is zoned for single-family use. Id.

26. The Planning Department is responsible for determining whether Rosa Lopez should apply for a special exception. See Benson Depo. at 92, 94.

27. In January 1995, the City's Planning Department determined that 1301 N. 66th Ave. "may be characterized as 'a place of worship'" that requires a special exception. See Exhibit 6; see also Cole Deposition at 87.

28. Commissioner Frances Russo, whose district embraces the Lopez home, stated that Ms. Lopez operates a "religious assembly" from her home. See Russo Depo. at 25.

29. The City Commission never requested that Rosa Lopez apply for a special exception for permission to operate a house of worship at 1301 N. 66th Ave. See Deposition of Mara Giulianti at 122–123, 176–177.

30. The City never made a formal determination that Ms. Lopez is not operating a house of worship. See Giulianti Depo. at 128 ("Q. [W]as a determination made that Rosa Lopez

-6-

did not have to apply for a special exception. A. No, . . . .").

31.   Commissioner Wasserstrom stated that the City has not asked Ms. Lopez to apply for a special exception because to do so would make the City "look bad." <u>See</u> Wasserstrom Depo. at 115–116.

32.   Between January 1994, and September 2001, no application for a special application was filed for the property located at 1301 N. 66th Ave. <u>See</u> Defendant's Responses to the United States' First Set of Requests for Admission at 2.

33.   In February 1996, the City received a complaint from a resident 7 blocks' distant from Rosa Lopez about noise at the Lopez home. <u>See</u> Defendant's Responses to the United States' First Set of Requests for Admission at 2.

34.   Residents have complained to the police and to City Commissioners about illegal parking associated with the religious gatherings at the Lopez home. <u>See</u> Declaration of Charles McPhail; Russo Depo. at 16–17, 18.

35.   The City of Hollywood Office of Code Enforcement has been aware, since at least 2000, of complaints made by neighbors of Rosa Lopez. <u>See</u> Russo Depo. at 18, 22.

36.   In the winter of 1994/95 and spring of 1995, the City of Hollywood Police Department, at least once a month, put up traffic barricades on North 66th Avenue in response to activities at 1301 N. 66th Avenue. <u>See</u> Sixth Set of Requests for Admission at 4.

37.   On August 13, 2005, at least 300 people gathered for a religious service at the Lopez home. <u>See</u> Chung Declaration at 3; Declaration of Shannon Schmitzer. People sat or stood on the sidewalk adjacent the Lopez home, on the driveway, inside of the Apparition Room, inside of her home, and in the garden alongside the house. <u>See</u> Chung Declaration at 3. In addition, hundreds of chairs were set up for the visitors. <u>See</u> <u>id.</u>

38.   Throughout the course of the day on August 13, 2005, visitors to the Lopez home parked their cars near the intersection of Arthur Street and 66th Avenue. Many of those cars parked on the lawns of nearby homes, against the flow of traffic, or in such a manner that they obstructed a portion of the sidewalk. No code enforcement officers or police officers issued parking tickets to these cars. <u>See</u> Chung Declaration at 3.

39.   Prayers are broadcast over a loudspeaker in connection with the gatherings at the Lopez home, including on August 13, 2005. McPhail Declaration; Chung Declaration at 3.

40.   Rosa Lopez and volunteers from the Loving Mother's Foundation sprinkled "holy water" on visitors to the Lopez home following the rosary service on August 13, 2005.  <u>See</u> Chung Declaration at 4.

41.   As of February 2006, religious gatherings were still being held on the 13th of every month at 1301 N. 66th Ave.  <u>See</u> Chung Declaration at 4.

42.   Religious gatherings are held at the Lopez home on days other than the 13th of the month, including on Sundays, <u>see</u> Schmitzer Declaration, Catholic holy days of obligation such as Easter, <u>see</u> Declaration of Theresa Ortega, and during the week, <u>see</u> Chung Declaration at 3.  For example on August 12, 2005, a "healing service" involving approximately ten people was held in the Apparition Room at the Lopez home.  <u>See</u> Chung Declaration at 3.

43.   The Apparition Room is open from 10:30 a.m. to 4:30 p.m., Monday through Friday, and from 11:00 a.m. to 4:00 p.m., Saturday and Sunday.  <u>See</u> Exhibit 6 to Chung Declaration.

44.   A non-profit corporation, the Our Loving Mother's Foundation, organizes the religious gatherings that occur at the Lopez home, publishes a monthly newsletter that solicits donations and provides the public with directions to the Lopez home, and maintains a website that provides information about Rosa Lopez.  <u>See</u> Chung Declaration at 3–5. The Foundation offers compact discs for sale over its website.  <u>Id.</u>

45.   The Loving Mother's Foundation was established to help Rosa Lopez disseminate messages from the Virgin Mary.  <u>See</u> Chung Declaration at 5.

46.   The business address of the Our Loving Mother's Foundation is 1301 N. 66th Ave.  <u>Id.</u>

47.   There is an "Apparition Room" at the Lopez home, which is separate from the residential area of the home, and which is open to visitors.  Chung Declaration at 2.  On at least some days, the "Apparition Room" at the Lopez home is staffed by a volunteer from the Our Loving Mother's Foundation who explains Ms. Lopez's visions to visitors.  <u>Id.</u> at 2.

48.   Religious articles such as rosaries, statues, and candles are sold from the Lopez property. Chung Declaration at 2–3.

49.   The City has never asked Ms. Lopez or the Our Loving Mother's Foundation to apply to the Planning Director for permission to use 1301 N. 66th Ave. for "other accessory uses." <u>See</u> Fifth Set of Requests for Admission at 1–2.

50.   Neither Ms. Lopez nor the Our Loving Mother's Foundation provided evidence to the

City of Hollywood Planning Director that the use of the real property located at 1301 N. 66th Avenue for any "other accessory uses" meets the criteria for accessory uses set forth in Section 4.1(e) of the ZLRD. Id. at 2.

51.    The City's Community Planning Director never determined that the use of Ms. Lopez's home as a place to sell religious items, including rosaries and medals, or as a place to host large religious gatherings would not adversely affect the "public safety, morals and general welfare of the community," or that such gatherings or activities are conducted in a manner that would provide "for the protection of surrounding property, persons and neighborhood values." Id. at 3–4. Nor has the Planning Director ever determined that the holding of monthly gatherings at the Lopez home for purposes of prayer is an "accessory use" that is "consistent with the [City's] Comprehensive Plan." Id. at 5.

52.    The City's expert testified that he did not "know the way to apply the zoning code to [Rosa Lopez]." See Cutro Depo. at 301.

53.    The City's current Planning Director testified that he was specifically directed not to visit the Lopez home. See Epstein Depo. at 385.

### 3. 2427–31 Taft Street Day Care

54.    On two occasions in the spring of 2002 the Office of Planning received special-exception applications to convert three single-family dwellings into a day care at 2427-2431 Taft Street, and on both occasions the Office of Planning recommended that the City deny the applications. See FLA0020063; FLA0020086; Epstein Depo. at 401, 412.

55.    The properties located at 2427-31 Taft Street are zoned for low-density, multiple-family use, and, at the time of the application for special exception, the properties were surrounded by single-family homes to the north, south, and east, and a multi-family duplex to the west. See FLA0020088; Epstein Depo. at 401.

56.    The application proposed to use one of the three properties as the main office area and the other two properties as the facilities in which children would be located and cared for. See FLA0020088. The proposed day care facility also included plans for two outdoor play areas. See FLA0020089.

57.    The applicant proposed to operate the day care from 6:30 a.m. to 6:00 p.m, for a maximum capacity of fifty children. See FLA0020088.

58.   True and accurate photographs of 2427–31 Taft Street are attached as Exhibit 3 to the declaration of Evan Chung. See Chung Declaration at 1.

59.   Taft Street is a county collector street. See Giulianti Depo. at 235; Epstein Depo. at 403.

60.   Taft Street is comparable to 46th Avenue. See Epstein Depo. at 403.

61.   The City of Hollywood's traffic engineer advised that the use of the three homes at 2427–31 Taft Street as a day care would create traffic problems, and recommended denying the application. See FLA0020065-FLA0020066.

62.   Comparing HCS and 2427–31 Taft Street, the Planning Director said, "They may be similar or dissimilar, depend[s] on how the groups function on the property." Id. at 405–406. He further testified, "[I]n both cases they are places where people assemble." Id. And both "generate more trash than a single family home." Id. at 409.

63.   The City's Planning Director testified that HCS and 2427–31 Taft Street are similar insofar as both HCS and the proposed day care use multiple buildings. See 410–411.

64.   The City's Planning Director testified that with respect to traffic, 2427–31 Taft Street has more of an impact on the surrounding community that HCS. See Epstein Depo. at 408.

65.   According to Commissioner Furr there was "lots" of community opposition to the conversion of the homes at 2427–31 Taft Street into a day care. See Furr Depo. at 63.

66.   The North Central Hollywood Civic Association submitted a letter to the Planning Division opposing the proposed day care facility. See FLA0020063.

67.   Each time the Planning Division reviewed the application, it determined that the day care facility was inconsistent with three of the four special-exception criteria, and recommended denial. In particular, the Planning Division found the proposed facility did not meet the criteria requiring compatibility, provision for safe pedestrian and vehicular traffic movement, and adequate setbacks, buffering and general amenities. See FLA0020069-70; FLA0020092-93.

68.   Among the Planning Division's concerns were noise and traffic impacts on neighboring properties. See FLA0020092-93.

69.   In May 2002, the DRB granted, with conditions, an application for a special exception to permit the conversion of three, single-family dwellings at 2427–31 Taft Street into a day care center. See Fourth Set of Requests for Admission at 1; Furr Depo. at 62.

70.  The only conditions imposed by the DRB required the applicant to (1) construct a six-foot "shadow box fence;" (2) "discuss and receive approval from the City's Landscape Inspector regarding type of hedge material" and add hedges along the east side of the property; and (3) "work with [the] City Traffic Engineer regarding the circular driveway and entrance/exit along Taft Street." See FLA0010054.

71.  No Commissioner appealed the decision of the DRB granting an application for a special exception to permit the conversion of three single-family dwellings into a day care center located at 2427–31 Taft Street. See Fourth Set of Requests for Admission.

72.  2427–31 Taft Street and HCS's property are comparable to a significant degree. See Weinstein Declaration at 3.

### 4. 5608–12 Taft Street Day Care

73.  In 1997, the City of Hollywood approved an application for a special exception to allow the expansion of the Just for Kids day care, located in a medium residential district, from 38 to 64 children. See Responses to the U.S.' First Set of Interrogatories at 4–5.

74.  Just for Kids operates from converted single-family homes. See Furr Depo. at 75.

75.  On October 13, 2000, there were 36 children present at the Just for Kids day care. See Declaration of Willie J. Cameron at A78. On June 22, 2001, there were 45 children present at the Just for Kids day care. See id. at A84.

76.  True and accurate photographs of 5608 Taft Street are attached as Exhibit 4 to the declaration of Evan Chung.

### D. Discrimination

#### 1. Intent to Discriminate on the Basis of Religion.

77.  Prior to September 2001, the City of Hollywood had never imposed a time limit on the grant of a special exception. See Fourth Set of Requests for Admission.

78.  Prior to September 2001, the City of Hollywood had never denied a special exception to a house of worship. See First Set of Interrogatories at 6–7.

79.  Members of the audience before the City Commission on September 12, 2001, made "anti-Semitic" statements about HCS, see Gonzales Depo. at 146, including statements such as, "We don't need these people in our community," and "[T]hese people are here, more of them are going to come." See Deposition of K. Wasserstrom at 24–25.

-11-

80. During the September 12, 2001 hearing on the Chabad's special-exception application, Mr. Oliveri told the attorney for the Chabad, "Your people need to stay on the north side of Sheridan Street." See Anderson Depo. at 138; Wasserstrom Depo. at 50–51.

81. When asked whether the City should prohibit religious gatherings at the Lopez home, Commissioner Oliveri said, "there is lot of disturbance out there with the parking. . . . the spiritual benefit that may be achieved by the people going [to the Lopez home] once a month far outweighed the inconvenience of that occasion." See Transcript of Sept. 12, 2001 meeting at 141.

82. The Chief of Police of the City of Hollywood increased the police presence at City Hall for the September 12, 2001 hearing on HCS's special-exception application. See Transcript of Sept. 12, 2001 meeting at 2.

83. Twice during the September 12, 2001 meeting the Mayor of Hollywood threatened to have the police remove people from the hearing room. See Transcript of Sept. 12, 2001 meeting at 52-53, 400.

84. The Mayor as well as Commissioners Wasserstrom, Furr, and Anderson described the Chabad's application as "controversial." See Giulianti Depo. at 98; Wasserstrom Depo. at 138; Anderson Depo. at 57; Furr Depo. at 100.

85. Commissioners Wasserstrom and Anderson testified that Commissioner Oliveri's political base would be threatened if more Orthodox Jews moved into Hollywood Hills. See Wasserstrom Depo. at 52; Anderson Depo. at 139–140.

86. Commissioner Wasserstrom stated that the controversy surrounding HCS's special exception application formed part of the basis for the City's denial of HCS application. See Wasserstrom Depo. at 138.

87. The Mayor stated that the purpose of the City's September 12, 2001 resolution was to require the Chabad to stop using 2215 and 2221 N. 46th Ave. as a place of worship. See Gonzales Depo. at 168; see also Furr Depo. at 65–66.

88. After September 12, 2001, Commissioner Oliveri requested that the City monitor the Chabad's property. See Def's Responses to HCS's First Set of Requests for Admission at 2–3.

89. The City's Director of Economic Development stated that after the September 12, 2001

-12-

meeting code enforcement officers visited the Chabad on a daily basis.  See Gonzales
Depo. at 192.

90.    Between May 2002, and April 2003, police officers conducted 102 self-initiated park-
and-walks at the Chabad.  See Exhibit 62.

91.    In October 2001, Commissioner Oliveri requested the Chief of Police to provide him with
regular reports of all police calls, including calls for traffic and parking violations, at the
Chabad.  See Gonzales Depo. at 175–176; see also Exhibit 39.

92.    In November 2001, Commissioner Oliveri asked the Director of Economic Development
to provide him with monthly reports of code violations at the Chabad.  See Gonzales
Depo. at 178.  Such a request, made directly by a Commissioner to a City Director,
violated City procedures.  See id. at 178–179.

93.    The Mayor of Hollywood stated that Commissioner Oliveri was "heavy handed" in
requesting that the City Manager and City personnel "continuously" check on the Chabad.
See Giulianti Depo. at 6–7.  She also stated that Commissioner Oliveri's "directives to
insist on daily inspections could be a problem."  See Exhibit 51.

94.    Commissioner Wasserstrom and the City's Director of Economic Development described
the City's treatment of the Chabad as excessive.  See Wasserstrom Depo. at 241;
Gonzales Depo. at 16–17, 230.

95.    On October 16, 2003, the City sent HCS a letter notifying it that it must desist holding
services at 2215 and 2221 N. 46th Avenue as of October 20, 2003.  See Complaint at 5.

96.    On October 20, 2003, the Department of Justice notified the City that it had begun
investigating whether the City had violated RLUIPA in its treatment of the Chabad.

97.    On July 7, 2004, the City Commission voted to enjoin the Chabad from operating as a
house of worship from 2215 and 2221 N. 46th Avenue.  That vote took place despite the
fact that the item was not on the agenda and no notice had been given to the Chabad or
the public that such a vote would take place.  See Complaint at 5.

98.    The City Commission does not normally vote on controversial items without first putting
those items on the agenda.  See Giulianti Depo. at 268–69.  According to the Mayor, "[i]t
would have been better to have put [the July 7, 2004 vote] on the agenda."  Id. at 268.

## 2. Disparate Treatment.

### a. Selective enforcement.

99.   Nativity church is a Catholic church located in a single-family residential neighborhood in Hollywood Hills. See Oliveri Depo. at 23–24.

100.  The City Manager, Commissioner Oliveri, a police captain, and "many members" of the police department attend Nativity Church. See Benson Depo. at 28; Oliveri Depo. at 13; Scarberry Depo. at 94–95.

101.  Cars regularly park at Nativity Church in such a manner that they obstruct the sidewalk. See Oliveri Depo. at 28–29 (identifying a car parked at Nativity so as to obstruct a sidewalk); see also Ramirez Depo. at 221–224 (identifying illegally parked cars at Nativity church).

102.  Residents of Hollywood Hills have complained to the City about parking at Nativity Church. See Russo Depo. at 89 ("Q. Have you heard complaints about parking at Nativity? A. Oh yes, they let people park all over."); Ramirez Depo. at 188, 220.

103.  The Director of the Office of Code Enforcement has never directed code enforcement officers to contact Nativity to request that parishioners at Nativity do not park illegally. See Milan Depo. at 87; see also Jacobs Depo. at 150.

104.  For the past ten years, the City has never issued a parking ticket to an illegally parked automobile at Nativity Catholic Church. See Def's Responses to HCS's First Set of Requests for Admission at 6–7.

105.  The City has sent police and code enforcement officers to monitor an illegal homeless shelter at a property known as the Jo-Lynn Apartments, see Furr Depo. at 112–113.

106.  The homeless shelter at the Jo-Lynn Apartments generated criminal activity, including the use of illegal narcotics. See Oliveri Depo. at 152 ("[They] were urinating in people's yards, knocking on their doors for money, falling asleep drunk on their patios, and calling the police to awaken them the next day. It was really a deplorable situation."), 159 ("The septic tanks were constantly backing up because the amount of intensity of people living there was way above the capacity of a septic tank."), 160; see also Furr Depo. at 86.

107.  The Chabad has not been accused of any activity associated with the sale of illegal narcotics. The City's accusations of the Chabad have focused on illegal parking and code

-14-

violations.  See Furr Depo. at 93; Oliveri Depo. at 167.

### b. 1713 Dewey Street (Apostolic Christian Church).

108.   Since 1987, the Apostolic Christian Church ("ACC") operated as a religious assembly or house of worship from a single-family home located at 1713 Dewey Street without a special exception.  See FLA0020680; see also Fourth Set of Requests for Admission; Supplemental Responses to U.S. Fourth Set of Requests for Admission at 1–2.

109.   In 2002, the City requested that ACC apply for a special exception.  See 435–436.

110.   1713 Dewey Street is located in the middle of a block and is surrounded by "residential properties to the north, south, east, and west."  See FLA0020680; Cutro Depo. at 246; see also Supplemental Responses to U.S. Fourth Set of Requests for Admission at 1–2.

111.   In 2002, the City of Hollywood granted a special exception to allow for the conversion of a residential home into a house of worship at 1713 Dewey Street.  Responses to U.S. Third Set of Requests for Admission at 1.  The house of worship permitted includes nine parking spaces, a sanctuary with seating for 36, two classrooms, one baby room, a kitchen, restrooms, and a changing room.  See FLA0020685.

112.   The Special Exception did not limit the number of persons allowed at the property.  See FLA0010048-FLA0010051.

113.   No Commissioner appealed the grant of a special exception to 1713 Dewey Street.  See Fourth Set of Requests for Admission.

114.   True and accurate photographs of 1713 Dewey Street are attached as Exhibit 5 to the declaration of Evan Chung.

115.   1713 Dewey Street and HCS's property are comparable to a significant degree.  See Weinstein Declaration at 3.

### c. 1406 Coolidge Street (Catholic Church in America)

116.   Ken Rosato, an ordained priest in the Catholic Church in America, owns a single-family home, in an area zoned for single-family residential use, on the real property located at 1406 Coolidge Street, Hollywood, Florida.  See Declaration of Ken Rosato at 1.

117.   In the fall of 2000, Mr. Rosato began renovating the home located at 1406 Coolidge Street for purposes of converting the dining and living rooms of that home into a chapel. See id.

-15-

118. From November 1, 2000, until the fall of 2002, Mr. Rosato presided over weekly religious services at 1406 Coolidge Street. Id. Those services regularly drew eight to ten persons. Services on Catholic Holy Days of Obligation and on feast days drew up to 30 persons. Id.

119. In approximately August 2001, one of Mr. Rosato's neighbors complained to the City of Hollywood about the renovations that Mr. Rosato had made to 1406 Coolidge Street and about the religious gatherings over which Mr. Rosato presided at 1406 Coolidge Street. Id. at 2; see also Milan Depo. at 127 (noting that Code Enforcement "received complaints [1406 Coolidge St.] was being operated as a house of worship).

120. A City of Hollywood code enforcement officer posted a notice of violation at 1406 Coolidge Street directing Mr. Rosato to cease using the property as a house of worship. Id.; see also 003802.

121. Mr. Rosato showed the code enforcement officer a copy of RLUIPA. See Rosato Declaration at 2. The City of Hollywood never directed Mr. Rosato to apply for a special exception to operate a house of worship at 1406 Coolidge Street. See id.

### d. 5808 Mayo Street (Harvest Time Apostolic Church).

122. Harvest Time Apostolic Church, located at 5808 Mayo Street, Hollywood, Florida, is a religious assembly or institution within the meaning of RLUIPA. See Sixth Set of Requests for Admission at 4.

123. Since April 1994, the property located at 5800 Mayo Street, Hollywood, Florida, has been zoned for single-family residential use. See Third Set of Requests for Admission at 3.

124. In June, 1998, Velma Wilmot applied on behalf of Harvest Time Apostolic Church for a special exception to use a single family residence at 5808 Mayo Street as a place of worship. See FLA0030092; see also Fourth Set of Requests for Admission; Supplemental Responses to U.S. Fourth Set of Requests for Admission at 1–2.

125. The Planning Division found the proposed use to be "compatible," but determined that the application was "inconsistent" with the remaining three special-exception criteria. See FLA0030094-FLA0030095, Fourth Set of Requests for Admission.

126. In June 1998, the City's Planning Division recommended that the BAA deny an application for a special exception to use a single-family residence located at 5808 Mayo

Street as a place of worship. <u>See</u> Fourth Set of Requests for Admission at 6;
FLA0030092–FLA0030095.

127. In July 1998, the BAA granted, with conditions, a special exception to convert a single-
family home located at 5808 Mayo Street into a house of worship. <u>See</u> Responses to U.S.
Fourth Set of Requests for Admission at 6. The conditions required that the applicant
"obtain all necessary permits" and "install all required paving, obtain drainage and
landscaping pursuant to all city requirements within 120 days of the Board's decision."
<u>See</u> FLA0030096-FLA0030097.

128. In February 1993, the City cited 5808 Mayo Street for having junk on the property,
including a table-tennis table, carpet padding, buckets, wood, metal, and a lawnmower.
<u>See</u> Sixth Set of Requests for Admission at 4. In March 1993, the owner of 5808 Mayo
Street was cited for a code violation involving an automobile on the property. <u>Id.</u> In
April 1993, the owner was cited for having junk on the property, including a mattress,
box springs, carpet, and a car axle. <u>Id.</u> In January 1994, the owner was cited for code
violations involving a truck. <u>Id.</u> The owner was cited for junk on the property in August
1995, this time couches and box springs. <u>Id.</u> In March 1996, the owner was cited for
having broken windows on the property, and in April 1996, the owner was cited for junk
on the property. <u>Id.</u> In December 1996, the owner was cited for having a fence on the
property for which there was no permit on record with the City. <u>Id.</u> In October 1997, the
City cited the owner of the property located at 5808 Mayo Street for "lawn parking." <u>Id.</u>

129. In 2003, the Harvest Time Apostolic Church applied to the City of Hollywood for a
special exception to allow the demolition of the place of worship and the construction of
a 3,725 square-foot place of worship at 5800 Mayo Street. <u>See</u> Fourth Set of Requests for
Admission at 6.

130. At the time of Harvest Time Apostolic Church's 2003 special-exception application, there
were two outstanding code violations on the property, one for a deteriorated chain-link
fence, and one for junk or furniture on the property. <u>See</u> FLA0020549; <u>see also</u>
Supplemental Responses to U.S. Fourth Set of Requests for Admission at 1–2.

131. In July 2003, the City of Hollywood Planning Staff noted, in connection with the 2003
special exception application of Harvest Time Apostolic Church, "that there are several

-17-

places of worship in the area, which makes the proposed development compatible with the existing area." See FLA0020552, FLA0020547–FLA0020659; Fourth Set of Requests for Admission at 6. The Planning Division found the 2003 application to be consistent with all four special-exception criteria. See FLA0020551–FLA0020554.

132. In 2003, the DRB approved, without conditions, an application for a special exception approving the construction of a place of worship at 5800 Mayo Street. See Fourth Set of Requests for Admission at 7; FLA0020533-FLA0020537. On the same day it approved the application for a special exception to Harvest Time Apostolic Church, the DRB also approved the design review and site plan applications, with one condition relating to the width of the drive isle. See FLA0020533-FLA00537.

133. No Commissioner appealed the 2003 decision of the DRB granting, with conditions, a special exception approving the construction of a place of worship at 5800 Mayo Street. See Fourth Set of Requests for Admission at 7.

### e. 725 N. 64th Ave. (Advent Christian Cathedral)

134. Since April 1994, the real property located at 725 North 64th Ave., in Hollywood, Florida, has been zoned for multi-family residential use. See Third Set of Requests for Admission at 5.

135. Advent Christian Cathedral operates at 725 North 64th Ave. See Responses to U.S. Fourth Set of Requests for Admission at 7.

136. In 2002, Francis Goode applied for a special exception to permit a place of worship at 725 North 64th Ave. See Fourth Set of Requests for Admission at 7.

137. The Office of Planning found the special-exception application for 725 N. 64th Avenue inconsistent with two of the four special-exception criteria, finding that the proposed use was not "compatible" with the surrounding area and lacked adequate setbacks, landscaping and general amenities. See FLA0020480-FLA0020483. The Planning Division recommended approval, subject to the planting and maintenance of hedges, and adherence to a landscape plan that had been submitted by the applicant. FLA0020480.

138. In May 2002, the DRB granted, with condition, a special exception permitting a house of worship, with 40 to 50 congregants, to be located at 725 North 64th Avenue. See Responses to U.S. Fourth Set of Requests for Admission at 7; FLA0020479. The

applicant stated that the church would operate three days a week. See FLA002480.

139. The only condition imposed by the DRB required the applicant to "discuss and receive approval from the City's Landscape Inspector regarding type of hedge material along the northern, southern, and eastern property line as well as 25 foot site triangle at northern corner of property." See FLA0010059-FLA0010060.

140. Advent Christian Cathedral operates from a converted meeting hall at 725 North 64th Avenue, which seats 64 persons. See FLA0020478. The property is located on a "moderately traveled roadway," see FLA0020482, and is bordered by a single-family home to the east and apartment units to the south, see FLA0020479.

141. No Commissioner appealed the 2002 decision of the DRB granting, with conditions, a special exception permitting a place of worship to be located at 725 North 64th Avenue. See Fourth Set of Requests for Admission at 7.

### f. 502 N. 28th Ave. (St. Mark's Lutheran Church)

142. Since April 1994, the real property located at 502, 504, and 505 North 28th Ave. has been zoned for single-family residential use. See Third Set of Requests for Admission at 6; see also FLA0020029.

143. In 1997, St. Mark's Lutheran Church applied for a special exception to convert a single-family home located at 502 N. 28th Avenue into a meeting hall. See Fourth Set of Requests for Admission.

144. In analyzing the special-exception application submitted by St. Mark's, the Office of Planning stated, "The building retains single family characteristics and blends well with the surrounding buildings." See FLA0020030.

145. At the time of St. Mark's application to establish a meeting hall at 502 N. 28th Ave., single-family homes were located to the south and east of 502 N. 28th Avenue. See FLA0020030; see also Fourth Set of Requests for Admission; First Supplemental Responses to U.S. Fourth Set of Requests for Admission at 1–2.

146. The Planning Division recommended that a special-exception be granted subject to conditions requiring the construction of a fence and the installation of swale trees. See FLA0020031; Fourth Set of Requests for Admission.

147. In June 1997, the BAA approved, with conditions, a special exception allowing St.

Mark's Lutheran Church to establish a meeting hall in a single-family home located at 502 N. 28th Avenue.  See Resolution SE-97-03; FLA0020038; Fourth Set of Requests for Admission.

148.   The special-exception approved by the BAA imposed only two conditions, requiring (1) that a six-foot high fence be constructed along the east property line, and (2) that swale trees be installed along Filmore Street and N. 28th Ave.  See FLA0020039; Fourth Set of Requests for Admission.

149.   No Commissioner appealed the BAA's decision granting St. Mark's Lutheran Church a special exception.  See Oliveri Depo. at 113–114.

Respectfully submitted this ___11th___ day of ___April___, 2006,

R. ALEXANDER ACOSTA
United States Attorney

WAN J. KIM
Assistant Attorney General
Civil Rights Division

MARILYNN LINDSEY
Assistant U.S. Attorney
500 E. Broward Blvd
Ft. Lauderdale, Fl. 33394
Florida Bar No.
Tel: (954) 356-7255
Fax: (954) 356-7336
E-mail: Marilynn.Lindsey@usdoj.gov

STEVEN H. ROSENBAUM , Chief
MICHAEL S. MAURER, Deputy Chief
SEAN KEVENEY, Trial Attorney
R. TAMAR HAGLER, Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., G Street
Washington, D.C. 20530
Tel: (202) 514-4838; Fax: (202) 514-1116
E-mail: Sean.R.Keveney@usdoj.gov