# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-61212-CIV-LENARD/KLEIN
[CONSOLIDATED WITH CASE NO. 05-60687-CIV-LENARD/KLEIN]

**HOLLYWOOD COMMUNITY SYNAGOGUE, INC.**

      Plaintiff,

vs.

**CITY OF HOLLYWOOD, FLORIDA and SAL OLIVERI, individually,**

      Defendants.

_____/



**UNITED STATES OF AMERICA,**

      Plaintiff,

vs.

**CITY OF HOLLYWOOD,**

      Defendant.

_____/

## OMNIBUS ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF HOLLYWOOD'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF HOLLYWOOD COMMUNITY SYNAGOGUE (D.E. 247); DENYING DEFENDANT CITY OF HOLLYWOOD'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF UNITED STATES (D.E. 177); AND DENYING SAL OLIVERI'S MOTION FOR SUMMARY JUDGMENT (D.E. 250)

**THIS CAUSE** is before the Court on Defendant City of Hollywood's Motion for

Summary Judgment Against Plaintiff, Hollywood Community Synagogue (D.E. 247), filed April 24, 2006; Defendant City of Hollywood's Motion for Summary Judgment against Plaintiff United States (D.E. 177), filed March 10, 2006; and Defendant Sal Oliveri's Motion for Summary Judgment (D.E. 250), filed April 24, 2006.  On May 23, 2006, Plaintiff Hollywood Community Synagogue ("HCS") filed a Response to the City's Motion for Summary Judgment Against HCS. (D.E. 292.)  On May 30, 2006, Defendant City of Hollywood ("the City") filed a Reply to its Motion for Summary Judgment Against HCS. (D.E. 306.) On April 11, 2006, Plaintiff United States filed a Response to the City's Motion for Summary Judgment Against Plaintiff United States (D.E. 228.) On May 1, 2006, the City filed a Reply to its Motion for Summary Judgment Against Plaintiff United States. (D.E. 258.) On May 23, 2006, Defendant HCS filed a Response to Oliveri's Motion for Summary Judgment. (D.E. 294.)  On May 30, 2006, Defendant Oliveri filed a Reply to his Motion for Summary Judgment. (D.E. 309.) Having considered the Motions, the Responses, the Replies, and the record, the Court finds as follows.

## I.    Factual and Procedural Background

On September 15, 2004, Plaintiff Hollywood Community Synagogue (hereinafter "HCS" or "the Synagogue") filed a Complaint against Defendants City of Hollywood (hereinafter "Defendant City" or "the City") and Sal Oliveri (hereinafter "Defendant Oliveri" or "Oliveri") (Case No. 04-61212-CIV-LENARD, D.E. 14), alleging violations of numerous rights and statutes, including  the Religious Land Use and Institutionalized Persons Act of

2000, 42 U.S.C. § 2000cc et seq. (hereinafter "RLUIPA."). On April 26, 2005, Plaintiff United States of America (hereinafter "Plaintiff United States" or "United States") filed a Complaint against Defendant City of Hollywood (Case No. 05-60687-CIV-LENARD, D.E. 1), requesting declaratory and injunctive relief based upon Defendant City's alleged violation of RLUIPA.  On June 16, 2005, the Court issued an Order consolidating these cases and administratively closing the higher numbered case (Case No. 04-61212-CIV-LENARD, D.E. 75; Case No. 05-60687-CIV-LENARD, D.E. 14), finding they involved common questions of law and fact.

On December 2, 2005, Plaintiff HCS was granted leave to file a Second Amended Complaint. (D.E. 124.)  Unless otherwise specified, the legal claims and facts which follow are taken from the allegations contained in the Second Amended Complaint (D.E. 125) in the consolidated case.

Plaintiff HCS is a Synagogue, with its principal place of business at 2215-2221 N. 46th Avenue, Hollywood, Florida 33021.  (D.E. 125 at ¶ 6.)  Defendant City of Hollywood is a city municipality authorized by the State of Florida to regulate the use of land and structures within the City's borders, consistent with law. (Id. at ¶7.) Defendant Sal Oliveri is a City Commissioner for the City of Hollywood, representing the area of Hollywood Hills. (Id. at ¶ 8.)

In 1999, Yosef Elul, then-President of the Synagogue, purchased two residences, located at 2215 and 2221 N. 46th Avenue, Hollywood, in a single family district.  (Id. at

¶15.)  In such single family districts, a place of worship[1] may operate only if granted a Special Exception.  (Id. at ¶ 19.)  After the purchase of the land by Yosef Elul, the Director of Planning for the City of Hollywood advised the Synagogue that it needed to apply for a Special Exception as a place of worship but assured Synagogue representatives that such Special Exception would be granted.  (Id. at ¶¶ 19-20.)

In May of 2001, Alan Razla, on behalf of Mr. Elul, applied for a Special Exception as a place of worship.  (Id. at ¶ 21.)  The Board of Appeal and Adjustments (hereinafter "BAA") granted a six month Special Exception.  (Id.)  Four months later, in September of 2001, Commissioner Oliveri filed an appeal to the City Commission of the BAA's grant of the Special Exception. (Id. at 22.)  The Commission heard the appeal and subsequently granted the Synagogue a one year Special Exception, which included certain conditions that limited parking and capacity. (Id.)  Plaintiff United States notes that, upon information and belief, Defendant City of Hollywood had never previously imposed a time limit on a special exception for a religious use, and had only once imposed a time limit on a special exception for a nonreligious use. (Case No. 05-60687-CIV-LENARD, D.E. 1 at ¶ 20.)

In late 2001 and early 2002, according to the allegations in Plaintiff HCS's Second Amended Complaint, Defendant Oliveri directed the City's code enforcement and/or police departments to issue citations and thereby harass the Synagogue and its members. (D.E. 125

---

[1] The City's Zoning and Land Development Regulations do not define place of worship, and thus the Court will look to the natural and ordinary meaning. Konikov v. Orange County, Fla., 410 F.3d 1317, 1325 (11th Cir. 2005). A "place" is defined as "a building or locality used for a special purpose." Webster's 3d New Int'l Unabridged Dictionary 1727 (1993). "Worship" is defined as "the reverence or veneration tendered a divine being or supernatural power." Id. at 2637. Thus, taken together, a "place of worship" is a building or locality used for the reverence or veneration of a divine being or supernatural power.

at ¶ 24.)  Oliveri allegedly told code enforcement and police officers that "careful and vigilant monitoring" of the Synagogue's properties was required, instructed them to check the Synagogue's property daily for code violations, and directed them to give tickets to cars parked on Plaintiff's property.  (Id. at ¶¶ 25-27.)  HCS's Administrator, George Albo, witnessed Code Enforcement and/or Hollywood Police Officers ticketing only those cars parked on the Synagogue's side of the street.  (Id. at ¶ 75.).  When Albo inquired as to why only cars belonging to the Synagogue were being ticketed, the officer stated that he was following directions from Defendant Oliveri.  (Id.)  In addition, a Code Enforcement Officer told Albo that the department was under orders from Commissioner Sal Oliveri and the Mayor to keep an eye on the Synagogue and to enforce the code. (Id. at ¶ 76.)  The Code Enforcement Officer further stated that she "paid special attention" to Plaintiff.  (Id.)

In August of 2002, Arthur Eckstein, on behalf of the Synagogue, applied to the Development Review Board (hereinafter "DRB," formerly known as the BAA) for a Special Exception.  In September of 2002, the DRB granted a six-month Temporary Special Exception subject to certain enumerated conditions and found that, subject to those conditions,[2] the use of the property as a place of worship was compatible with the existing natural environment and other properties within the vicinity. (Id. at ¶¶ 30, 31(A).)  After the DRB hearing, Defendant Sal Oliveri filed an appeal to the Commission. (Id. at ¶ 32.)  In

---

[2] The conditions imposed by the DRB were: (1) parking of any type is prohibited in the alley located behind the Synagogue; (2) the Synagogue must enter into a lease agreement for off-site parking, (3) the Synagogue must obtain garbage dumpsters in a size and style acceptable to City staff, (4) the Synagogue must enter into a property maintenance agreement with a property maintenance provider who will maintain the premises in accordance with the City Code, and (5) the Synagogue must work with City staff to create a buffer along the rear side of the property.  (D.E. 125, at ¶ 30.)

October 2002, the Commission denied Oliveri's appeal and allowed HCS the six-month Temporary Special Exception. (Id. at ¶ 33.)

In March of 2003, the DRB granted the Synagogue a Permanent Special Exception subject to the satisfaction of certain conditions[3] within 180 days. (Id. at ¶ 37.) Defendant Sal Oliveri filed another appeal. (Id. at ¶ 38.) On June 5, 2003, only 53 days after the Permanent Special Exception was granted, the Commission reversed the decision made by the DRB. (Id. at ¶ 39.) Among other things, the Commission claimed that the Synagogue was "too controversial." (Id. at ¶ 41.) "Controversiality" is not defined by the City Code as a factor to be evaluated when considering whether to grant a Special Exception. (Id. at ¶ 44.) Plaintiff HCS states that contrary to Commission procedure, Defendant Sal Oliveri was permitted to vote on his own appeal and cast the deciding vote (4-3)[4] against the Synagogue. (Id. at ¶ 40.) Defendant Oliveri stated, "it's almost common sense and reasonable that 'the Chabad' will never fit in Hollywood Hills." (Id. at ¶ 41 (internal quotation marks added).) Plaintiff United States notes that, upon information and belief, Defendant City of Hollywood had never previously denied a request by a place of worship to operate in ether a single-family or multiple-family residential zone. (Case No. 05-60687-CIV-LENARD, D.E. 1 at ¶ 28.)

---

[3] The conditions imposed by the DRB require the Synagogue to: (1) build a six-foot soundproof wall at the rear property line; (2) provide for appropriate three-sided dumpster as approved by the City's Public Works Department; (3) provide additional landscaping along the north and south property lines as determined appropriate by the City's Office of Planning; and (4) provide a site plan to the City's Planning Staff that demonstrates how the Synagogue will satisfy the first three conditions. (D.E. 125, at ¶ 37.)

[4] Plaintiff United States' Complaint contains a discrepancy in that it alleges that the Commission voted 5-2 to reverse the DRB's decision and deny HCS's petition for a third Special Exception. (Case No. 05-60687-CIV-LENARD, D.E. 1 at ¶ 27.)

On October 16, 2003, Defendant City of Hollywood sent HCS a letter notifying the congregation that it was to cease holding services and other related activities at its current location within one week. (Id. at ¶ 30.) Thereafter, Defendant Oliveri openly campaigned against the Synagogue in his 2004 campaign for City Commissioner of Hollywood Hills. (D.E. 125 at ¶ 45.) At a July 2004 Commission meeting, Oliveri asked the Commission "to evict" the Synagogue and allegedly stated in support thereof, "I would just like to ask the Commission and I beg for their support for the sake of the neighborhoods here... We're talking about neighborhoods here. We're talking about neighborhoods having a smell."[5] (Id. at ¶ 47.) During a July 7, 2004 meeting, the City Commission voted to direct the City Attorney to file a lawsuit to stop further organized religious services from taking place at the Synagogue, despite the fact that this item was not on the agenda and no notice had been provided to HCS or the public that such a vote would take place. (Case No. 05-60687-CIV-LENARD, D.E. 1 at ¶ 32.) On or about July 16, 2004, the City filed suit against the Synagogue, in Broward County Circuit Court, Case No. 04-11444 (21), seeking declaratory and injunctive relief against the Synagogue for operating as a place of worship without a Special Exception. (D.E. 125 at ¶ 57.)

Plaintiff HCS asserts and lists at least nineteen places of worship located in Hollywood Hills residential neighborhoods, some of which are located in single family

---

[5] Defendant Oliveri subsequently stated that his comment was an effort to compare his efforts to protect his single family district with the City of Hollywood's efforts to protect the Hollywood Lakes district from a smelly waste treatment facility. (Am. Compl.; Ex. H.)

districts. (Id. at ¶ 48.)  Additionally, Plaintiff HCS asserts that a single family residence owned by Rosa Lopez, located blocks away from the Synagogue, has for more than a decade operated a "shrine" to the Virgin Mary. (Id. at ¶ 51.)  She takes donations from visitors, operates a commercial gift shop, and hosts as many as 4,000 people at one time. (Id.)  The City of Hollywood has received numerous complaints regarding the traffic, noise and garbage associated with the residence of Ms. Lopez, but has failed to take any action. (Id. at ¶¶ 52-53.)  Ms. Lopez has never applied for a Special Exception. (Id. at ¶ 53.)  When Defendant Sal Oliveri was asked by the Synagogue why Ms. Lopez was not required to obtain a Special Exception, he allegedly replied, "it's a miracle to true believers and the venue cannot be changed since the Virgin Mary visits that particular home... If you people know anything about the Catholic religion, that's called a vision.  To Christians and Catholics, that is considered a miracle.  That's not establishing a house of worship.  That is a miracle." (Id. at ¶ 54.)

Plaintiff HCS further asserts that one place of worship operated for approximately thirteen years without having applied for a Special Exception. (Id. at ¶ 49.)  It is further alleged that after inquiry by the Synagogue, this place of worship applied for and was immediately granted a Special Exception. (Id.)

Plaintiff HCS alleges that the perceived issues of "noise," "garbage," or "traffic" were no greater for the Synagogue than those posed by other places of worship operating within the City. (Id. at ¶ 55.)  HCS contends that the reversal of the DRB's grant of a permanent

Special Exception, was arbitrary, capricious and unreasonable. (Id. at ¶ 56.)

Plaintiff HCS alleges the following 18 Counts against Defendant City of Hollywood in its Second Amended Complaint: Count I - damages for violation of the Synagogue's right to free exercise of religion; Count II - injunctive relief for violation of the Synagogue's right to free exercise of religion; Count IV - damages for violation of RLUIPA (42 U.S.C. § 2000cc(a)(1) - substantial burden); Count V - injunctive relief for violation of RLUIPA (42 U.S.C. § 2000cc(a)(1) - substantial burden); Count VI - damages for violation of RLUIPA (42 U.S.C. § 2000cc(b)(1) - unequal terms); Count VII - injunctive relief for violation of RLUIPA (42 U.S.C. § 2000cc(b)(1) - unequal terms); Count VIII - damages for violation of RLUIPA (42 U.S.C. § 2000cc(b)(2) - discrimination); Count IX - injunctive relief for violation of RLUIPA (42 U.S.C. § 2000cc(b)(2) - discrimination); Count X - damages for violation of the Florida Religious Freedom Restoration Act of 1998 (Florida RFRA); Count XI - injunctive relief for violation of the Florida RFRA; Count XII - damages for violation of the Equal Protection Clause; Count XIII - injunctive relief for violation of the Equal Protection Clause; Count XIV - damages for violation of the Substantive Due Process Clause of the Fourteenth Amendment; Count XV - injunctive relief for violation of the Substantive Due Process Clause of the Fourteenth Amendment; Count XVI - promissory estoppel; Count XVII - facial equal protection challenge to Article V of the City of Hollywood Code of Ordinances; Count XVIII - as applied equal protection challenge to Article V of the City of Hollywood Code of Ordinances; and Count XIX - preliminary injunctive relief. (D.E. 125

at ¶¶ 60-151.) Plaintiff HCS's Second Amended Complaint also asserts two claims against Defendant Sal Oliveri, individually: Count III - damages for violation of the Synagogue's right to free exercise of religion; and Count XII - damages for violation of the Equal Protection Clause. (Id. at ¶¶ 72-80, 113-121.) Plaintiff United States' Complaint contains substantially similar facts to Plaintiff HCS's Second Amended Complaint and requests that the Court grant injunctive and declaratory relief against Defendant City of Hollywood for violations of two provisions of RLUIPA, 42 U.S.C. § 2000cc(b)(1)-(2), based on treatment of HCS on less than equal terms with nonreligious assemblies and discrimination against HCS on the basis of religion or religious denomination. (Case No. 05-60687-CIV-LENARD, D.E. 1 at 6.)

On May 10, 2006, the Court issued an Order Granting in Part and Denying in Part Defendant City of Hollywood's Motion to Dismiss. (D.E. 272.) Therein, the Court: 1) dismissed Counts I and II with prejudice in part as to any claims related to an alleged City policy of regularly granting Special Exceptions; 2) dismissed Counts IV, V, X, and XI with prejudice; 3) dismissed Count XIX without prejudice; and 4) denied Defendant's Motion with respect to all other Counts. (Id. at 61-62.) On June 16, 2006, the Court issued an oral ruling on Plaintiff HCS's Motion for Partial Summary Judgment, finding that the City's Special Exception zoning ordinances were unconstitutional on their face as they related to places of worship, in violation of the First Amendment. (D.E. 354.)[6]

---

[6] Oral Ruling supplemented by written Order issued on June 26, 2006. (D.E. 370.)

II.    **City of Hollywood's Motion for Summary Judgment Against Plaintiff HCS**

A.    **Parties' Arguments**

In the City's Motion for Summary Judgment Against HCS (D.E. 247), Defendant City of Hollywood moves for summary judgment on Counts I, II, VI, VII, VIII, IX, XII, XIII, XIV, and XV.[7] (Id. at 1.)  First, Defendant addresses Counts I, II, XIV and XV, Plaintiff HCS's § 1983 claims.  Defendant City of Hollywood argues that egregious police conduct is necessary to make out a § 1983 claim for police harassment or selective enforcement. (Id. at 4.)  Defendant maintains that here, there is no record evidence that police officers or code enforcement officers engaged in egregious conduct.  Specifically, the City states that there is no evidence they entered HCS's premises, identified or interrogated congregants, stopped congregants upon exiting the Synagogue, engaged in surveillance of the premises, sat for long hours outside HCS, or confiscated any member's belongings. (Id. at 5.)  Defendant points to testimony of officers indicating they issued tickets only in response to complaints, and often after attempting to gain voluntary correction of violations. (Id. at 5-6.)  The City further disputes that there was a directive to conduct "park-and-walks" at the Synagogue. (Id. at 8.)

In addition, Defendant City challenges Plaintiff HCS's claim that the City's filing of

---

[7] Defendant City of Hollywood filed its Motion prior to the Court issuing its May 10, 2006 Order on Defendant's Motion to Dismiss and its June 16, 2006 oral ruling on Plaintiff HCS's Motion for Partial Summary Judgment.  To the extent that the pleadings on any Motions for Summary Judgment address issues rendered moot by the Court's prior Orders, these arguments will be ignored.

a state court suit seeking a declaratory judgment and injunctive relief to prevent the use of the Synagogue's property as a place of worship is actionable under § 1983. (Id. at 11.)  The City argues than any claim for misuse of the legal procedure as a means of harassment must demonstrate egregious conduct, and that the simple filing of a state court suit, without more, is not actionable under § 1983. (Id. at 11-12.)

Defendant City of Hollywood next argues that its denial of a Special Exception failed to violate Plaintiff HCS's rights to freedom of assembly, substantive due process or equal protection. (Id. at 13.)  Defendant maintains that, as the City's zoning ordinances at issue do not limit the liberties of all persons, the Synagogue's challenge is not cognizable as a substantive due process concern. (Id. at 14.)  The City also argues that there is no evidence that the denial of the Special Exception was an arbitrary or unreasonable act not substantially related to concerns of public health, safety, welfare or morals. (Id.)  In support of this argument, the City cites the testimony of City Commissioners that they voted to deny Plaintiff's application for a Special Exception for permissible reasons. (Id. at 15-16.)

Finally, as to Plaintiff's § 1983 claims, Defendant City of Hollywood argues that Plaintiff HCS has failed to demonstrate a violation of its equal protection rights as it has not shown that any similarly situated entities received more favorable treatment. (Id. at 16.) Defendant also argues that the Synagogue's freedom of assembly has not been deprived because HCS has many areas available to it in the City of Hollywood to freely assemble and worship as a matter of right. (Id. at 17.)

-12-

Second, Defendant City of Hollywood addresses Plaintiff's remaining RLUIPA claims (Counts VI, VII, VIII, and IX). The City argues that a § (b) claim requires a showing that "similarly situated" uses were treated differently. (D.E. 177 at 6-7.) Defendant City contends that the Eleventh Circuit's definition of "similarly situated" in the equal protection context should control. (Id. at 9.) The City asserts that compared uses should share the same type of zoning district, the same land use designation, the same frequency of gathering, and comparable community impacts. (Id. at 10.) Defendant maintains that Plaintiff has failed to establish that any other institutions were similarly situated when considering whether the Synagogue was treated on equal terms or suffered discrimination. (Id. at 13, 16.) The City further identifies and distinguishes numerous comparable properties from that of the Synagogue. (Id. at 13-25.)

Third, Defendant City of Hollywood moves for summary judgment on Plaintiff's equal protection claims, Counts XII and XIII. Defendant City argues first that Plaintiff's equal protection claims are subsumed within its RLUIPA § (b) claims. (D.E. 247 at 20.) Alternatively, Defendant maintains that Plaintiff must, as with RLUIPA, demonstrate that the Synagogue was treated differently than similarly situated entities. (Id.) As the City contends that Plaintiff has made no showing of similarly situated uses, religious or nonreligious, that received preferential treatment, its equal protection claims must fail. (Id.)

In its Response (D.E. 292), Plaintiff HCS first disputes Defendant's arguments raised in support of granting summary judgment on its § 1983 claims for selective enforcement and

harassment. (Id. at 1.) HCS points to evidence indicating that monitoring of the Synagogue's property was motivated by the directives of Defendant Oliveri. (Id. at 2.)  Further, the Synagogue argues that the City may not justify the level of police and code activity as responses to anonymous citizen complaints, as many such complaints have been determined unfounded. (Id. at 5-6.)  HCS asserts that there is evidence of similar parking violations, not ticketed, at other religious institutions in the neighborhood. (Id. at 6.)  Plaintiff argues that its selective enforcement and harassment claims raise factual issues which require jury determination and are thus not ripe for decision on summary judgment. (Id. at 7.)

Second, Plaintiff argues that Defendant City's act of filing a state court suit to enjoin HCS from operating a place of worship in its current location was an act in furtherance of the City's pattern of harassing the Synagogue for exercising its First Amendment rights. (Id.) HCS further maintains that the City knew or should have known that it was filing suit on the basis of an unconstitutional scheme of zoning ordinances in violation of § 1983. (Id. at 7-8.)

Third, Plaintiff HCS argues that it suffered a violation of its substantive due process rights under § 1983 via an arbitrary and capricious denial of a constitutionally-protected property right by the City. (Id. at 9.)  The Synagogue maintains that the determination of whether a zoning decision is "arbitrary and capricious" is a question of law for the court. (Id.) The Synagogue argues that the criteria contained in the City's Zoning and Land Development Regulations (ZLDR) are unconstitutionally vague, and therefore provided Defendant City of Hollywood unbridled discretion in evaluating HCS's application for a Special Exception.

-14-

(Id.)  The Synagogue further points to evidence that impermissible considerations entered into the Commission's decision. (Id.)  Finally, HCS contends that it had a vested property right in the Synagogue's property because it reasonably relied on the DRB's grant of a Permanent Special Exception to its detriment. (Id. at 12.)  Thus, Plaintiff HCS maintains that the City is estopped from denying the Special Exception. (Id.)

Fourth, in addressing its RLUIPA claims, Plaintiff adopts the arguments advanced by the United States in its Response to the City's Motion for Summary Judgment Against the United States. (D.E. 228.)  Therein, Plaintiff United States argues, inter alia, that substantial evidence exists that the City's decision to deny Plaintiff HCS a Special Exception was made on the basis of the Synagogue's religious denomination, namely, Hasidic Judaism. (Id. at 5.)  The United States also maintains that there is substantial evidence that the City discriminated against the Synagogue by treating it differently than other properties. (Id.)  Plaintiff United States points to numerous properties that hosted assemblies that were religious in nature, but which were never required to apply for a Special Exception. (Id. at 6-8.)  Plaintiff also cites evidence of numerous religious institutions that received Special Exceptions, despite either failing to meet all four criteria or failing to come before the City Commission. (Id. at 8-9.)  Plaintiff further presents evidence that other nonreligious institutions were treated more favorably than the Synagogue (Id. at 10.)  The United States further argues that it has demonstrated disputed facts underlying its equal terms and nondiscrimination claims by presenting evidence of similarly situated institutions. (Id. at 11-22.)

Finally, the United States maintains that even absent evidence of other properties, there is sufficient evidence that Plaintiff HCS was the victim of religious discrimination to support its § 2(b)(2) claim. (Id. at 22-23.) Plaintiff United States contends that no showing of disparate treatment is necessary to maintain such a claim.  Instead, the United States argues that evidence of discriminatory intent on the part of the City, including discriminatory slurs from the crowd, comments by a City Commissioner during the meeting on the Synagogue's Special Exception application, statements by Commissioners that the Synagogue's application was controversial, and the City's decision to file a state court suit against the Synagogue without notice to the public, support its cause of action under the nondiscrimination provision of RLUIPA. (Id. at 23-24.)  Such evidence is in addition to the fact that the Synagogue was subjected to daily visits by code enforcement officers, that such violations went unpunished at other institutions, that Plaintiff HCS was the only religious institution to receive a limit on the number of people who could attend services or a time limit on the use of its property for religious services, and that Defendant City of Hollywood had never before denied a request by a place of worship to operate in a single-family or multiple-family residential zone. (Id. at 6, 23-24.)

On the C ity's final claim, the Synagogue also adopts Plaintiff United States' arguments regarding similarly situated properties in support of its equal protection claims. (Id. at 14.) Plaintiff HCS argues that it has demonstrated that there exists a genuine issue of material fact as to whether other similarly situated entities were treated differently during the

Special Exception process. (Id.)

In its Reply to its Motion for Summary Judgment Against Plaintiff HCS (D.E. 306), the City of Hollywood again argues that the Synagogue has not demonstrated egregious police conduct sufficient to support a § 1983 claim of police harassment. (Id. at 1.) Defendant avers that there is no evidence that the City retaliated against HCS to deter members from exercising their religious beliefs or that a person of ordinary firmness would, in fact, have been deterred from exercising such beliefs. (Id. at 2-3.) The City maintains that a parking ticket would not deter a person of ordinary firmness from exercising their beliefs and that the Synagogue has presented no evidence that its members' First Amendment expression was actually chilled. (Id. at 3.) The City further argues that its park-and-walks were not conducted frequently enough to constitute egregious police conduct and that mere surveillance by government authorities is insufficient to give rise to a First Amendment violation. (Id. at 5-6.) Defendant contends that the presence of police or code enforcement officers at or near the Synagogue bore a substantial relation to legitimate law enforcement. (Id. at 6.)    Finally, the City contests that the Synagogue's evidence regarding code enforcement demonstrates unconstitutional practices. (Id. at 7-8.)

Second, Defendant City of Hollywood contends that Plaintiff HCS's claim that the City retaliated against it by filing a state court suit is without merit. (Id. at 8-9.) The City maintains that the Synagogue has not shown any evidence of retaliation. (Id.) Moreover, Defendant argues that filing suit with knowledge or constructive knowledge that it was

seeking to enforce an unconstitutional statute does not itself make out a deprivation of a constitutional right. (Id. at 9.)

Third, in regard to Plaintiff's due process claim, Defendant City argues that Plaintiff HCS cites no evidence of impermissible considerations, improper motive or pretextual means by the City. (Id.)  The City further asserts that the Synagogue has cited no evidence demonstrating good faith reliance on the DRB's 2003 grant of a Permanent Special Exception, such as evidence of substantial expenses. (Id. at 9-10.)  Defendant City argues that the DRB's grant made it clear that the Synagogue would have to reapply in three years. (Id. at 10.)  Thus, Defendant City of Hollywood maintains that any expenses incurred with knowledge that the matter was on appeal would not have been made in good faith detrimental reliance. (Id.)

Finally, as to Plaintiff's equal protection claims, Defendant argues that the Court is well within its authority to rule as a matter of law that certain properties and uses are not similarly situated. (Id.)  In support, Defendant argues that Plaintiff has failed to meet the prima facie showing that other institutions are identical in all relevant respects to survive summary judgment. (Id.)

### B.    Analysis

#### 1.    Standard of Review

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. Adickes v.

-18-

S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c).  The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S.317, 322-23 (1986).  The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; see also Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  Once this initial demonstration under rule 56(c) is made, the

-19-

burden of production, not persuasion, shifts to the nonmoving party.  The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324; see also Fed.R.Civ.P. 56(e).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio corp., 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." Id. at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Id.

### 2.      HCS's First Amendment Claims (Counts I and II)

In order to obtain relief under § 1983, Plaintiff must demonstrate that conduct under color of state law, complained of in the civil rights suit, violated its rights, privileges, or immunities under the Constitution or laws of the United States. Whitehorn v. Harrelson, 758 F.2d 1416, 1419 (11th Cir. 1985).  Moreover, the Supreme Court has placed strict limitations on municipal liability under section 1983. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998), citing Monell v. Department of Social Servs., 436 U.S. 658, 691 (1978).  There is no respondeat superior liability upon which to inculpate a municipality for the wrongful actions of its employees or agents. 436 U.S. at 691, 694.  Thus, a municipality can only be held liable if an official policy or custom of that municipality causes a constitutional violation. Monell, 436 U.S. at 694-95.  It is not enough for the plaintiff to merely identify

conduct properly attributable to the municipality; the plaintiff must also demonstrate that, through deliberate conduct, the municipality is the moving force behind the alleged injury. Board of County Com'rs v. Brown, 520 U.S. 397, 404 (1997).

In its May 10, 2006 Order of Dismissal, the Court dismissed any § 1983 claim relating to an alleged City policy of routinely granting Special Exceptions. (D.E. 272.) In its June 16, 2006 oral ruling Granting Plaintiff's Motion for Partial Summary Judgment ("Minutes of Pretrial Conference," D.E. 354),[8] the Court granted summary judgment on HCS's § 1983 claims relating to the one incident of the City denying Plaintiff's application for a Special Exception. Thus, the sole remaining basis for Plaintiff's § 1983 claims that the Court must address herein is the allegation that the City of Hollywood violated Plaintiff's constitutional rights via a policy of harassment and selective enforcement.

Plaintiff HCS claims its First Amendment rights were violated by the knowing harassment and selective enforcement of code violations by Defendant City of Hollywood, as well as by the retaliatory filing of a state law suit to enjoin the operation of a place of worship. The Eleventh Circuit has held that, "the continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983." Depew v City of St. Marys, Georgia, 787 F.2d 1496, 1499 (11th Cir. 1986). Moreover, in Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005), the Court of Appeals held that, "[a] plaintiff suffers adverse action if the defendant's

---

[8] Oral Ruling supplemented by written Order issued June 26, 2006. (D.E. 370.)

allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Id. at 1254. The Court went on to hold that a prolonged and organized campaign of harassment by local police officers was sufficiently adverse that a jury could find they would chill a person of ordinary firmness form exercising his or her First Amendment rights. Id. at 1254-55.

In its Order of May 10, 2006, the Court found that the City's policy of harassment, selective enforcement and retaliation alleged by Plaintiff was sufficient to constitute the moving force behind the Synagogue's injuries. See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1312 (11th Cir. 2001) (City's tolerance of gross sexual harassment and failure to take action despite actual and constructive knowledge of the problem constituted a moving force). The Court, therefore, must only address whether there is a genuine issue of material fact that harassment and selective enforcement rose to a level sufficient to violate Plaintiff's rights under the Constitution.

Defendant City of Hollywood has argued that there is no record evidence that police and code enforcement officers have violated the Synagogue's First Amendment rights, as there's no evidence of, inter alia officers entering the premises, stopping or interrogating congregants, or engaging in surveillance. (D.E. 247 at 4-5.) In its Statement of Material Facts (D.E. 248), the City provides evidence intended to support this argument, including testimony from Officer Stephanie Ramirez that she never performed surveillance of the Synagogue but instead waited for violations to occur (Id. at ¶ 2), that she would not

automatically issue citations for violations but would ticket flagrant violations (Id. at ¶ 3), and that she would attempt to gain voluntary compliance to correct violations. (Id. at ¶ 4.) The City also cites testimony of Officer Susan Jacobs stating that her visits to Plaintiff's properties were the result of daily complaints (Id. at ¶ 9), that the violations she issued were no different from those she had written for other properties (Id. at ¶ 11), and that she had documented violations of conditions of at least two other Special Exceptions, besides those at HCS. (Id. at ¶ 12.) Moreover, the City cites testimony suggesting that code officers were not directed to monitor the Synagogue. (Id. at ¶ 8, 13.) Thus, Defendant City maintains that the conduct of its police and code enforcement officers did not rise to the level of egregiousness necessary for a § 1983 violation.

In response, Plaintiff argues that egregiousness is not necessary, but that a prolonged and organized campaign of harassment by local police is sufficient to demonstrate its claim under § 1983. (D.E. 292 at 2.) The Synagogue provides significant evidence to support the existence of such a campaign, including a communication from Defendant Sal Oliveri stating that "careful and vigilant monitoring and reporting of violations" of the Synagogue was required (Id. at Ex. B), a communication from City Chief of Police Jim Scarberry noting that, "[p]er Commissioner Oliveri's request, the Police Department... will continue to monitor and provide a monthly synopsis of activity" (Id. at Ex. C), and various communications from City officials indicating that HCS properties were visited daily (Id. at Ex. D-F.) The Synagogue has also provided evidence that various City officials were concerned with the level of police

and enforcement activity and the behavior of Commissioner Sal Oliveri, including Commissioner Cathy Anderson, who expressed concern over the City's and Oliveri's legal expenses in dealing with the Synagogue and wrote that "[t]he surveillance on 'the Chabad' and Rabbi's home is 365 days per year, 24 hours a day and borders on harassment," (Id. at Ex. G (internal quotation marks added)) and Mayor Mara Giulianti, who responded to a concerned citizen via email that "I agree with you that Commissioner Oliveri's behavior was out-of-line... Unfortunately, [the City Manager] probably allowed the enforcement to be overly zealous because of Commissioner Oliveri's urging." (Id. at Ex. G.)  Furthermore, in the Synagogue's Statement of Material Facts (D.E. 296), Plaintiff HCS provides evidence that numerous City officials found unusual Oliveri's requests for monthly reports of code activity at a particular property. (See id at ¶¶ 15-18.)

The Court finds Plaintiff HCS has presented substantial evidence demonstrating a pattern of harassment and selective enforcement sufficient to create a genuine issue of fact of whether the City has violated Plaintiff's constitutional rights.  Further, the Court finds that the Defendant City's reliance on the standard of "egregiousness" for police conduct to violate § 1983 is misplaced; it is clear that a prolonged and organized campaign of harassment by local police officers may be sufficient to chill First Amendment rights for purposes of § 1983. Bennett, 423 F.3d at 1254-55.

3.      **Plaintiff HCS's Substantive Due Process Claims (Counts XIV and XV)**

In Counts XIV and XV, Plaintiff HCS alleges that the Commission's reversal of the decision of the DRB to grant a permanent Special Exception was arbitrary, capricious and unreasonable because it bore no substantial relation to issues of public health, safety, welfare, or morals. (D.E. 125 at ¶ 126.) Moreover, the Synagogue claims that it had a property interest in the DRB's grant of a Special Exception because the Synagogue expended money in good faith reliance on the DRB's conditions for the granting of a permanent Special Exception. (Id. at ¶ 128.) Thus, the Synagogue alleges that its substantive due process rights were violated by the Commission's reversal. (Id. at 34-35.)

In Greenbriar, Ltd., v. City of Alabaster, the Eleventh Circuit noted the long-established tenet that zoning regulations would not be declared unconstitutional as violative of substantive due process unless they were "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." 881 F.2d 1570, 1577 (11th Cir. 1989), quoting Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365 (1926). The Greenbriar Court further stated the two-pronged test for violations of substantive due process: (1) it must be determined that there has been a deprivation of a federal constitutionally protected interest, and (2) that deprivation must be the result of an abuse of governmental power sufficient to raise an ordinary tort to the statute of a constitutional violation. 881 F.2d at 1577, citing Rymer v. Douglas County, 764 F.2d 796, 801 (11th Cir. 1985). The Court then elaborated that the second prong was met when the deprivation was undertaken for an improper motive and by means that were pretextual,

arbitrary and capricious, and without any rational basis. Id. (citations and quotation marks omitted).

In Coral Springs Street Systems, Inc. v. City of Sunrise, the Eleventh Circuit held that vested rights could be created, thus engendering an enforceable entitlement to satisfy the first prong of the test, when a party had reasonably and detrimentally relied on existing law, creating the conditions of equitable estoppel. 371 F.3d 1320, 1334 (11th Cir. 2004). Under Florida law, the doctrine of equitable estoppel may be raised against a local government when a property owner: (1) in good faith; (2) upon an act or omission of the government; (3) has made such a substantial change in position or incurs such substantial expenses that it would be highly inequitable and unjust to destroy the right the owner acquired. Id. (citations and quotation marks omitted). As further explained by the Court in Coral Springs,

> the theory of equitable estoppel amounts to nothing more than an application of the rules of fair play. One party will not be permitted to invite another onto a welcome mat and then be permitted to snatch the mat away to the detriment of the party induced or permitted to stand thereon. A citizen is entitled to rely on the assurances or commitments of a zoning authority and if he does, the zoning authority is bound by its representations, whether they be in the form of words or deeds...

Id. at 1334-35, quoting Town of Largo v. Imperial Homes Corp, 309 So.2d 571, 573 (Fla.Dist.Ct.App. 1975).

Here, Plaintiff has failed to provide any evidence that it made a substantial change in position or incurred substantial expenses in reliance upon the representations of the City of Hollywood. Though HCS lists numerous actions that were allegedly taken in reliance on the

DRB's grant of a Permanent Special Exception with conditions (D.E. 292 at 12), it provides no record evidence to support these assertions. At Pretrial Conference, held June 16, 2006, Plaintiff HCS indicated that, though it could not provide specific cites, such evidence was contained in the depositions of Rabbi Joseph Korf and Arthur Eckstein. ("Transcript of Pretrial Conference," D.E. 354 at 59:12-19.)   However, after thorough review of the deposition of Korf, containing extensive discussion of the Synagogue's alleged damages, the Court finds no reference to substantial expenses incurred in reliance on the City's grant of a temporary Special Exception. (See Deposition of Rabbi Joseph Korf at 104-224.) Although Arthur Eckstein testified that the Synagogue entered into a six-month agreement for off-site parking as a result of requests from the City around 2003, costing the Synagogue 250-300 dollars per month (see Deposition of Arthur Eckstein at 107:9-18; 119:6-120:3), Eckstein provides no testimony about any other specific or substantial expenditures in reliance on City requests.   The Court finds that evidence of this brief contract alone is insufficient to show a genuine issue on whether the Synagogue undertook such a substantial change in position or incurred such substantial expenses that it would be highly inequitable or unjust to revoke its Special Exception. As the nonmoving party, Plaintiff HCS must do more than allege facts purporting to show a genuine issue of material fact; the Synagogue must designate specific facts in depositions, answers to interrogatories, affidavits or admissions on file that demonstrate the existence of a genuine issue. Celotex, 477 U.S. at 324; see also Fed.R.Civ.P. 56(e). Plaintiff has therefore not met its burden with respect to equitable estoppel, and the

-27-

Court will grant Defendant's Motion on these grounds.

However, Plaintiff HCS also argues that Defendant City's decision to revoke the Synagogue's Special Exception denied HCS of its constitutionally protected rights because the revocation was arbitrary and capricious. On this claim, the Court finds that the first prong of the <u>Greenbriar</u> test, that there has been a deprivation of federal constitutionally protected interest, has been met by the City's revocation of the Synagogue's Special Exception. The Court announced at oral arguments that it had found the City's zoning ordinances unconstitutional as they related to Special Exceptions for places of worship because they granted unbridled discretion to officials. The Court hereby finds that by applying this unconstitutional statute to the Synagogue, Defendant City of Hollywood deprived Plaintiff HCS of its constitutional right to free exercise of religion.

On the second prong, the <u>Greenbriar</u> Court held that a deprivation is the result of an abuse of governmental power of constitutional stature if it is undertaken "for an improper motive and by means that were pretextual, arbitrary and capricious, and... without any rational basis." 881 F.2d at 1577 (quotation marks omitted). In the instant case, Plaintiff has provided the following facts in support of its argument that the City's decision was arbitrary and capricious or made for an improper motive. First, Commissioner Sal Oliveri stated that he voted against granting the Synagogue a Special Exception because no matter what efforts HCS made or conditions the Commission put upon them, the Synagogue "does not fit and, in my opinion, will never fit" in its neighborhood in the City of Hollywood. (<u>See</u> Oliveri

Deposition at 132:5-134:22.)  Second, Mayor Mara Giulianti stated that Oliveri's "actions as a commissioner, to be perfectly honest, were not – were very – I think they were very personal in many respects." (Giulianti Deposition at 256:11-13.) She also stated that, she felt that Oliveri's behavior was out of line and that in "15 years I have never seen such a single focus." (D.E. 352, Ex. A at 413:14-20.) Third, Giulianti stated that she, moreover, had personally voted against the Special Exception in part to avoid setting a dangerous precedent that the City didn't enforce its zoning codes. (See id. at 187:10-188:23.)   Fourth, Commissioner Keith Wasserstrom characterized the Synagogue issue as a controversial and divisive issue, and stated that, in his opinion, part of the reason for the Commission's denial of the Synagogue's Special Exception was because of this controversial and divisive characteristic. ("Wasserstrom Deposition," D.E. 217, Ex. 3 at 138:11-139:17.) These facts, taken together, raise a genuine issue of material fact as to whether the Commission's decision to deny the Synagogue a Special Exception was arbitrary or unreasonable, or undertaken based upon a pretextual or improper motive.  Therefore, Defendant has not met its burden of demonstrating that there is no genuine issue of material fact with respect to any essential element of Plaintiff's substantive due process claim, as it relates to the arbitrary and capricious denial of Plaintiff's First Amendment rights.  Accordingly, Defendant's Motion is denied as to this portion of Plaintiff's Counts XIV and XV.

### 4.    Plaintiff HCS's RLUIPA Claims (Counts VI, VII, VIII and IX)

-29-

Plaintiff HCS's Counts VI and VII are made pursuant to RLUIPA section (b)(1), the "equal terms" provision. This provision states, "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).  As Plaintiff alleges that the City applied its zoning ordinances differently to the Synagogue as compared to other nonreligious institutions, its claims can be categorized as an "as-applied" equal terms challenge under RLUIPA. The Eleventh Circuit recently held, in Primera Iglesia v. Broward County, that a plaintiff bringing an as-applied equal terms RLUIPA claim must offer evidence of a similarly situated comparator that was treated differently to make out a claim. 2006 WL 1493825, at *11 (11th Cir.).  The Court further held that the standard for comparison of religious and nonreligious assemblies or institutions should be the "similarly situated" standard from the Eleventh Circuit's equal protection cases, as articulated in Campbell v. Rainbow City, Ala., 434 F.3d 1306 (11th Cir. 2006). Id. Thus, in order for any property to be similarly situated to the Synagogue, it must be prima facie identical in all relevant respects. Campbell, 434 F.3d at 1314.

The Eleventh Circuit in Konikov v. Orange County, Fla., 410 F.3d 1317, 1324 (11th Cir. 2005), found that whether a zoning code had been implemented in a manner violative of the equal terms provision of RLUIPA required a thorough review of the record and an examination of evidence considered by the governmental body in question, including the frequency of meetings, the number of people and vehicles at the properties, and whether

-30-

invitation to meetings and services was extended to the public. Id. at 1327. Thus, the Court in the instant case will compare the record evidence pertaining to the Synagogue and other nonreligious assemblies and institutions in the light most favorable to Plaintiffs, to see if there exists a genuine issue of material fact as to whether the City treated the two on less than equal terms. In doing so, the Court adopts the findings of the Konikov Court regarding the applicable definitions of the relevant terms for RLUIPA purposes. Thus, an "assembly" is defined as "a company of persons collected together in one place and usually for some common purpose (as deliberation and legislation, worship, or social entertainment)." Id. at 1325 (citations omitted). An "institution" is defined as "an established society or corporation: an establishment or foundation [especially] of a public character..." Id. (citations omitted).

Plaintiff HCS, in adopting the arguments advanced by Plaintiff United States, points to evidence with respect to two institutions that the Court finds raises a genuine issue regarding whether they are similarly situated for equal terms purposes. First, Plaintiff argues that the day care facility located at 2427-2431 Taft Street is comparable to HCS in that it is located on a street comparable to 46th Avenue where the Synagogue is located ("United States' Statement of Material Facts," D.E. 229 at ¶ 60), it is located in a comparable zoning district (Id. at ¶ 55), the City Planning Director testified that both properties were places where people assembled, generated more trash than a single family home, and used multiple buildings, and that the day care center at Taft Street had more of an impact on the

-31-

surrounding community than the HCS. (Id. at ¶¶ 62-64.)  Plaintiff further notes that one Commissioner testified that there was "lots" of community opposition to conversion for both properties. (Id. at ¶ 65.)  Despite the City Planning Commission's recommendation that the City deny the day care center's application for a Special Exception, based upon the determination that the day care center was inconsistent with three of the four Special Exception criteria (based on concerns over compatibility, traffic, setbacks, and noise), the DRB granted (with conditions) the center a Special Exception to convert three single-family dwellings into a day care facility. (Id. at ¶¶ 67-69.)  Further, Plaintiff provides evidence that no Commissioner appealed this decision. (Id. at ¶ 71.)

Defendant City of Hollywood disputes the characterization of the property at 2427-2431 Taft Street as comparable to the Synagogue and provides the following evidence in support.  Defendant notes that the property at 2427-2431 Taft Street was zoned for "low/Medium Multi-Family Residential" use, whereas the Synagogue was in an area zoned for "low residential" single family use. ("City of Hollywood's Statement of Material Facts Regarding Motion Against U.S.," D.E. 248 at ¶¶ 59-61, 65.)  The City has pointed out that the permissible density in Multi-Family Residential districts is greater than that allowed in single family neighborhoods. (Transcript of Pretrial Conference at 61:23-62:16, 63:18-64:4.)

The Court finds that the argument Defendant City of Hollywood makes that the two properties are not similarly situated based upon the different permissible densities of the two areas suggests that the Synagogue had a relatively greater impact on its surroundings.

-32-

However, Plaintiff HCS has presented testimony indicating that the daycare center had a greater impact on the surrounding community than the Synagogue. Moreover, in Multiple Family Districts, "day care facilities" are treated as permitted uses subject to the DRB's grant of a Special Exception. (D.E. 191, Ex. B at § 4.2.) Thus, day care facilities are treated under exactly the same rubric in Multiple Family zoning districts as the Synagogue is in its Single Family zoning district. (See id. at 4.1.) Finally, Jacqueline Gonzalez testified that, in her observations, day care centers have peak hours that have created more traffic problems than the Synagogue. (Gonzalez Deposition at 186:9-21.) Therefore, the record evidence contains a genuine issue of material fact with respect to whether the daycare center at 2427-2431 Taft street is similarly situated to the Synagogue.

Second, Plaintiff HCS points to the home of Rosa Lopez as evidence of another nonreligious institution[9] that was treated on less than equal terms by Defendant City of Hollywood. Plaintiff argues that Rosa Lopez's residence constitutes an "assembly" for RLUIPA purposes because groups of persons gather there, often in an organized fashion, for the purposes of prayer and receiving healing benefits. (D.E. 228 at 19.) In support of its argument that the property is identical to the Synagogue's property, Plaintiff notes that the property is in a neighborhood zoned for single-family use, people gather each month for religious services, Defendant has received complaints from neighbors about noise and illegal

---

[9] As described in more detail below, Plaintiff United States maintains that the home of Rosa Lopez should be treated as a religious institution for purposes of the Court's analysis, and argues in the alternative that it is a comparable nonreligious institution in the event the Court finds it was nonreligious in nature. (D.E. 228 at 18.)

parking, Lopez sells religious articles from her home, and Lopez operates an "Apparition Room" that is open to visitors daily. (United States' Statement of Material Facts at ¶¶ 24-25, 33-35, 41-43, 47-48.) However, the City of Hollywood has never requested that Lopez apply for a Special Exception, either to operate as a place of worship, as a meeting hall, or for "other accessory uses," and no such application was ever filed as of September 2001. (Id. at ¶¶ 29-32, 49-51.) Moreover, Defendant City's current Planning Director testified that he was specifically directed not to visit the Lopez home. (Id. at ¶ 53.) Therefore, if Lopez's property is not considered a religious institution under RLUIPA, Plaintiff argues it is a similarly situated property for purposes of its equal terms claim.

Defendant argues that Rosa Lopez is not a similarly situated assembly or institution for RLUIPA purposes. Defendant claims, inter alia, that Ms. Lopez uses the property primarily as a residence, that there is no unusual behavior surrounding the property on days other than the 13th of the month, and that there have been no structural changes to the house to remove it from characterization as a single-family home. (City of Hollywood's Statement of Material Facts Regarding Motion Against U.S. at ¶¶ 41-42, 47-50.)

The Court finds that the home of Rosa Lopez may be characterized as more than merely a "[s]ingle family detached dwelling," defined by the ZLDR as "[a] dwelling occupied by not more than one family; a dwelling comprised of only one dwelling unit" and constituting the main permitted use in a Single Family District. (D.E. 355 at § 2.2; D.E. 191, Ex. B at § 4.1)  Record evidence shows that the Lopez home is often occupied by hundreds

if not thousands of people. Yet, Lopez has not been required to apply for any permits for her additional uses. The ZLDR provides that a property owner must apply to the Community Planning Director to approve "other accessory uses" (aside from uses customarily associated with single family homes[10]), if a number of criteria are met. (D.E. 191, Ex. B at § 4.1.E.) Despite the fact that record evidence demonstrates that Lopez is offering religious articles on her property in exchange for "donations," she has never been required to obtain a permit for an accessory use.

Further, "meeting halls and similar nonprofit uses" are also considered Special Exceptions under the ZLDR in Single Family Districts. As the code does not define "meeting halls," the Court gives it its ordinary or natural meaning. Konikov, 410 F.3d at 1325, citing Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1230 (11th Cir. 2004). Though "meeting hall" is not given an independent definition,[11] the meaning of the compound term can be derived from the meanings of the individual terms. A "meeting" is defined as "an act or process for coming together." Webster's 3d New Int'l Unabridged Dictionary 1404 (1993). A "hall" is defined, alternatively, as "a) A building for public meetings or entertainments; b) The large room in which such events are held." Webster's II New College Dictionary 500 (1995). Taken together, the Court finds that the ordinary and natural meaning of "meeting hall" is a building used for the act or process of coming

---

[10] Such uses customarily associated with single family homes include, but are not limited to, decks, swimming pools, spas, sheds, ornamental features and tennis courts. (D.E. 191, Ex. B at § 4.1.E.)

[11] However, "meetinghouse" is defined as "a building used for public assembly." See Webster's 3d Int'l Unabridged Dictionary 1404 (1993).

together. The record evidence demonstrates that Lopez regularly hosted visitors who came together for a common purpose at her residence, namely, to pay homage to the Virgin Mary. Therefore, the Court finds that there exists a material issue of genuine fact as to whether the Lopez residence fits the definition of meeting hall, and thus was a similarly situated institution or assembly for purposes of RLUIPA and Defendant City's Special Exception provisions. Thus, Defendant's Motion for Summary Judgment as to Plaintiff's as-applied equal terms claim under RLUIPA is denied.

Plaintiff's Counts VIII and IX are as-applied challenges made pursuant to RLUIPA section (b)(2), the "nondiscrimination" provision. This provision states, "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Defendant City of Hollywood's primary argument in favor of summary judgment is that Plaintiff HCS has not demonstrated that the Synagogue was discriminated against compared to other similarly-situated religious institutions. However, the Parties, acknowledging a dearth of case law regarding the applicable standard of comparison for assemblies or institutions under RLUIPA, have stipulated that discriminatory intent is a required showing under section (b)(2).

Plaintiff HCS, in adopting the arguments of Plaintiff United States, argues that discriminatory intent is shown by the following facts. First, that the City of Hollywood has never before denied a Special Exception to a place of worship or even imposed a time limit

on the grant of a Special Exception. (United States' Statement of Material Facts at ¶¶ 77-78.) Second, that a City Commissioner made discriminatory comments about the Synagogue in comparison to the Lopez property at a City meeting such as, "the spiritual benefit that may be achieved by the people going [to the Lopez home] once a month far outweighed the inconvenience of that occasion." (Id. at ¶ 81.)  Third, that on July 7, 2004, Defendant City voted to enjoin the Synagogue from operating as a place of worship without placing the item on the agenda or giving notice to the public or the Synagogue that such a vote would take place, an unusual act. (Id. at ¶¶ 97-98.) Fourth, Plaintiff HCS points to facts regarding the disparate treatment received by the Nativity Catholic Church, located in a single family residential neighborhood in Hollywood Hills. (Id. at ¶ 99.)  Plaintiff cites record evidence showing that numerous City officials attend this Church, that cars regularly park illegally at the Church, that residents of the City have complained for years about parking at the Church, and that Defendant City has not issued a parking ticket to an illegally parked car at Nativity Church in ten years. (Id. at ¶¶ 100-104.)  All of these facts raise an inference of discriminatory treatment and intent on the part of the City of Hollywood toward Hollywood Community Synagogue, as compared to other religious institutions, including the Nativity Church.

Plaintiff HCS also points to facts regarding numerous other religious institutions, most notably the house of Rosa Lopez, that received differential treatment.  As noted above, despite the fact that Lopez's home attracts numerous visitors for religious services and

generates complaints about noise and parking, Lopez has never been required to apply for a Special Exception as a place of worship. (Id. at ¶¶ 24-25, 29-35, 41-43, 47-51.) Moreover, as noted above, the City's current Planning Director testified that he was specifically directed not to visit the Lopez home. (Id. at ¶ 53.)

The City's ZLDR does not define place of worship, and thus the Court will again look to the natural and ordinary meaning. Konikov, 410 F.3d at 1325. A "place" is defined as "a building or locality used for a special purpose." Webster's 3d New Int'l Unabridged Dictionary 1727 (1993). "Worship" is defined as "the reverence or veneration tendered a divine being or supernatural power." Id. at 2637. Thus, taken together, a "place of worship" is a building or locality used for the reverence or veneration of a divine being or supernatural power. The record evidence presented by Plaintiff demonstrates that Lopez was holding monthly public gatherings at her home to pay homage to the Virgin Mary. This creates a genuine issue of material fact as to whether Lopez was operating a place of worship under the City's ZLDR and was thus similarly situated for RLUIPA purposes.

Therefore, the Court finds that the above facts are sufficient to generate a genuine issue of material fact as to Plaintiff HCS's section (b)(2) claims under RLUIPA, and defeat Defendant City of Hollywood's Motion for Summary Judgment as to those claims.

### 5.   Plaintiff's Equal Protection Claims (Counts XII and XIII)

Plaintiff HCS's Counts XII and XIII allege violations of the Equal Protection Clause of the Fourteenth Amendment for differential treatment of the Synagogue by the Defendant

City of Hollywood as compared to other similarly situated places of worship. <u>Primera Iglesia</u> at *11, <u>citing</u> <u>Campbell</u>, 434 F.3d at 1314.  For the reasons discussed above, Plaintiff has demonstrated that there exists a genuine issue of material fact with respect to whether other places of worship were similarly situated and treated disparately by the Defendant City. Therefore, summary judgment on these claims must be denied.

**III.    Defendant City of Hollywood's Motion for Summary Judgment Against Plaintiff United States**

Defendant City of Hollywood likewise moves for Summary Judgment on both of Plaintiff United States' Claims under RLUIPA section (b)(1) and (b)(2).  The City argues that Plaintiff United States has not shown that other similarly situated institutions were treated disparately compared to the Synagogue.  As noted above, the standard for finding another entity as similarly situated is identical as that identified for as-applied equal terms challenges under RLUIPA.  As the Court has already addressed this issue above in discussing the identical claims by Plaintiff HCS, and the Parties make no new or additional arguments with respect to Plaintiff United States, the Court adopts its previous findings and finds genuine issues of material fact exist as to Plaintiff United States sections (b)(1) and (b)(2) claims. Accordingly, the City of Hollywood's Motion for Summary Judgment Against Plaintiff United States is denied.

**IV.    Defendant Sal Oliveri's Motion for Summary Judgment Against Plaintiff HCS**

### A.    Parties' Arguments

In his Motion for Summary Judgment (D.E. 250), Defendant Sal Oliveri argues that the Court should grant summary judgment as to Count III, the Synagogue's § 1983 for violation of its right to free exercise of religion, and Count XII, the Synagogue's equal protection claim for damages. In support, Defendant Oliveri first argues that he's entitled to absolute immunity because he is a legislator who was engaged in furtherance of his duties. (Id. at 4.) Oliveri maintains that information-gathering is an essential element of the legislative function, and that his efforts to obtain monthly reports on police and code enforcement violations at the Synagogue were intended to assure that the policy dictated by the Commission be followed and to help decide City policy. (Id. at 5.) Second, Defendant Oliveri argues he's entitled to qualified immunity because he was acting within his discretionary authority. (Id. at 6.) Defendant Oliveri further argues that the Synagogue has not shown a change in its schedule, lost membership, or how any such loss or overzealous enforcement could be attributed to him. (Id.) Third, Defendant Oliveri argues that the statements attributed to him cannot establish discriminatory intent because they were taken out of context. (Id. at 7-8.) Fourth, Defendant Oliveri argues that the home of Rosa Lopez is not similarly situated for equal protection purposes. (Id. at 8-12.)

In its Response (D.E. 294), Plaintiff HCS argues first that Defendant Oliveri is not entitled to absolute or legislative immunity. (Id. at 1.) Plaintiff contends that legislative immunity does not apply to all actions by a legislator, but only those taken within his

legitimate legislative activity, which does not encompass zoning enforcement or the application of policy to a specific party. (<u>Id.</u> at 1-3.) Second, the Synagogue argues that Oliveri is not entitled to qualified immunity because Defendant has not shown that targeting the Synagogue was within the scope of his discretionary authority and because such action constituted a known constitutional violation. (<u>Id.</u> at 3-7.) Further, Plaintiff HCS argues that intent is an element of the underlying constitutional violation of the Equal Protection Clause, and that the jury should be left to decide whether Defendant Oliveri's comments demonstrate discriminatory intent. (<u>Id.</u> at 7-10.) Third, Plaintiff maintains that whether Rosa Lopez is similarly situated is a question for the jury. (<u>Id.</u> at 10-12.) Finally, on its equal protection claim, the Synagogue contends that the evidence shows that park and walks were motivated by Defendant Oliveri and that Defendant Oliveri's proffered testimony of Officers Stephanie Ramirez and Susan Jacobs does not establish that these officers actually looked for violations at surrounding properties. (<u>Id.</u> at 13-14.)

In his Reply, Defendant Oliveri argues that numerous statements cited by Plaintiff HCS constitute inadmissible hearsay upon which the Court cannot rely for summary judgment purposes. (D.E. 309 at 1-3.) Oliveri further argues that having City of Hollywood employees monitor HCS's premises is not an known constitutional violation. (<u>Id.</u> at 11.) Finally, Defendant Oliveri maintains that, because Rosa Lopez's house is out of his district, he could not possibly be liable for an equal protection claim based upon disparate treatment of Lopez. (<u>Id.</u> at 16.) Moreover, Defendant Oliveri argues that none of the other churches

identified by Plaintiff generated complaints from neighbors, and thus could not be considered similarly situated to HCS, which generated numerous complaints. (Id. at 17.)

In Plaintiff HCS's Sur-Reply (D.E. 352), permitted by the Court to address claims raised for the first time in Defendant Oliveri's Reply, HCS argues that it relied on numerous statements that were not hearsay because they constituted party admissions. (Id. at 2.) Plaintiff also points to numerous comments in the record suggesting that Defendant Oliveri's actions were not within the scope of his authorized duties. (Id. at 2-8.)

### B.    Analysis

Summary judgment is appropriate if Defendant can demonstrate that there is no genuine issue of material fact with respect to the claims made against him. Matsushita, 475 U.S. at 586. Defendant has argued that he is entitled to absolute immunity and qualified immunity on both Counts against him, and that, regardless of whether immunity is found, summary judgment should be granted on both Counts. The Court shall address each of these arguments in turn.

### 1.    Absolute Immunity

It is well settled that legislators are protected by absolute immunity in their legislative functions. Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). This holding has been extended by the Eleventh Circuit to purely local legislators in land use and zoning cases. Corn v. City of Lauderdale, 997 F.2d 1369, 1392 (11th Cir. 1993). However, not all actions taken by local legislators are subject to this protection; absolute legislative immunity "extends only to

actions taken within the sphere of legitimate legislative activity." Id. (citations and quotation marks omitted). While actions taken in connection with promulgating zoning ordinances and classifications, even the decision about which zoning classification should be applied to a specific parcel of land, have been held to be protected by legislative immunity, see id., citing Baytree of Inverray Realty Partners v. City of Lauderhill, 873 F.2d 1407, 1409 (11th Cir. 1989), the application of policy to a specific party, including the denial of a development permit, has been held not protected by legislative immunity. See id., citing Crymes v. DeKalb County, 923 F.2d 1482, 1485-86 (11th Cir. 1991).

Thus, Defendant Oliveri's argument that he was seeking to enforce the City's ordinances through his efforts is unavailing. Alternatively, Defendant Oliveri argues that his requests for monthly reports on police and code enforcement violation at Plaintiff's properties were undertaken to gather information for the Commission to decide City policy. Information-gathering and investigation, it is true, have been deemed essential elements of the legislative function. See McGrain v. Daugherty, 273 U.S. 135, 175 (1927); Tenney et al. v. Brandhove, 341 U.S. 367, 377-78 (1951).  However, whether this is the proper characterization of Oliveri's activities is a disputed fact.

Plaintiff HCS argues that Defendant Oliveri personally demanded excessive levels of enforcement out of a desire to make the Synagogue leave, and not in furtherance of any bonafide legislative purpose.  The Synagogue points first to the fact that the memo from Defendant Oliveri to Director of Economic Development and Development Administration

-43-

Jacqueline Gonzales states that "careful and vigilant monitoring and reporting of violations is required." (D.E. 294, Ex. A.)  The Synagogue argues that this is a directive to code enforcement officers and police officers, not an effort to gather information. (Transcript of Pretrial Conference at 21:23-25.)  Second, HCS notes that Commissioners do not have authority to order inspections of a particular property or to order code enforcement to issue tickets at a particular property, and that Defendant Oliveri failed to follow the proper procedure when sending the aforementioned memo. ("Plaintiff's Statement of Material Facts in Opposition to Oliveri's Motion," D.E. 296 at ¶¶ 1-3.)  Moreover, City Mayor Mara Giulianti noted in her deposition that Oliveri had no authority to command staff, and that the City Manager determined what staff actions were going to be. (Giulianti Deposition at 253:12-17.)  Giulianti added, "the bottom line is [Oliveri] doesn't have the ability to demand that staff do anything; he's not allowed to.  He could be removed from office if he did; it would be a violation of the charter for him to direct staff." (Id. at 255:20-24.)  She stated further that Defendant Oliveri's "actions as a commissioner, to be perfectly honest, were not – were very – I think they were very personal in many respects." (Id. at 256:11-13.)

The Court determines that Defendant has not provided evidence sufficient to invoke the doctrine of absolute immunity.  The uncontroverted evidence establishes that Defendant Oliveri was acting in furtherance of non-legislative goals, as the primary focus of Oliver's activities was on code enforcement, rather than information-gathering.  Moreover, to the extent that Defendant Oliveri was collecting information on the Synagogue, the application

-44-

of legislative policy to a specific party, including on the issuance of a permit, is not protected by legislative immunity. See Crymes, 923 F.2d at 1485-86. The Court finds that absolute immunity is not available to Defendant Oliveri in this case.

### 2.    Qualified Immunity

Defendant Oliveri also asserts that he is entitled to qualified immunity in this action. Qualified immunity shields from civil liability government officials sued in their individual capacity who act pursuant to discretionary authority insofar as their conduct does not knowingly violate, "clearly established statutory or constitutional rights of which a reasonable person would have known." Ray v. Foltz, 370 F.3d 1079, 1081 (11th Cir. 2004)(citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)); Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1267 (11th Cir. 2003); Kyle K. v. Chapman, 208 F.3d 940, 942 (11th Cir. 2000). Because of the important policies served by the qualified immunity defense,[12] it should be applied to shield all government officials "but the plainly incompetent and those who knowingly violated the law." Ray, 370 F.3d at 1082.

Under the first step of the qualified immunity analysis, the public official must prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place. Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003)(citing Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991)). In

---

[12]The purpose of qualified immunity is to allow government officials to carry out their discretionary duties without fear of personal liability or harassing litigation. Consolidated City of Jacksonville, 341 F.3d at 1267; see also Ray, 370 F.3d at 1082 (discussing other important public policies served by the qualified immunity defense).

-45-

determining whether the public official has met his burden, the Court is advised to,

> ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize....In applying each prong of this test, look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.

O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004)(citing Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004)).

Once the public official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity does not apply. Storck, 354 F.3d at 1314 (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)). The Supreme Court has provided the following two-part test for determining if the plaintiff has met its burden: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right, and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine whether the right was clearly established. Id. (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001)). In addition, a Court should address a defendant's claim of entitlement to qualified immunity as to each count asserted against the public official. GJR Investments Inc., 132 F.3d at 1370. A district court's failure to address claims possibly barred by qualified immunity undermines the policies served by the qualified immunity defense. Id.

-46-

Plaintiff HCS alleges that Defendant Oliveri violated the Synagogue's rights to Free Exercise and Free Association under the First and Fourteenth Amendments and Plaintiff's right to Equal Protection under the Fourteenth Amendment. Accordingly, the Court will apply the Eleventh Circuit's two-part test to both of these claims.

Both of Plaintiff's claims against Defendant Oliveri center on his role in retaliation and harassment, via selective code enforcement, against the Synagogue. Defendant Oliveri argues that if there was overzealous enforcement, it cannot be imputed to him, and that any role he had in any enforcement against the Synagogue was pursuant to the proper exercise of his discretionary authority to manage his district and respond to the needs and demands of his constituents. (D.E. 250 at 6-8.) Plaintiff HCS counters that Defendant Oliveri has failed to demonstrate he was acting within his discretionary authority by targeting the Synagogue and singling it out for daily monitoring. The Synagogue cites the evidence supporting the fact that Commissioners do not have the authority to order inspections of a particular property or to order code enforcement to issue tickets at a particular property. (Plaintiff's Statement of Material Facts in Opposition to Oliveri's Motion at ¶¶ 1-3.) Further, Jacqueline Gonzalez testified that this was the only situation she recalled of a City Commissioner asking the chief of police to provide him with updates of parking violations at a property that received a Special Exception, that Oliveri specifically asked her to investigate all code violations at the Synagogue and investigate whether they were operating a day care, and that the level of enforcement against the synagogue bordered on harassment.

(Gonzalez Deposition at 176:25-177:15, 184:15-23, 239:2-13, 242:12-14.)

The Court must first examine whether Defendant Oliveri was performing a legitimate job-related function through means that were within his power to utilize. In doing so, the Court recognizes that it is to look to the general nature of Defendant Oliveri's actions, putting aside any infirmity caused by his alleged unconstitutional actions. Holloman, 370 F.3d at 1266. Here, taking the evidence in the light most favorable to Plaintiff HCS, the general nature of Defendant Oliveri's actions appear to have been enforcement-related. Substantial testimony indicates that Defendant Oliveri failed to follow proper procedure in engaging in the direction of staff, a role generally reserved for the City Manager in the executive branch of the City government structure. Constant monitoring of one particular party is not the role of a legislator, who generally focuses on policy issues with global significance. The record evidence does not support Oliveri's contention that it is undisputed that he was acting within his discretionary authority.

Moreover, even if the Court was to find that Defendant was acting within his discretion, the burden would then shift to Plaintiff to demonstrate that Defendant Oliveri violated clearly established law based upon objective standards. Hightower v. Evans, 117 F.3d 1318, 1320 (11th Cir. 1997). This standard requires that the alleged unlawfulness was evident in light of pre-existing case law at the time of the alleged constitutional violation. Hope v. Pelzer, 536 U.S. 730, 739-41 (2002).

The Court finds that Plaintiff HCS has met its burden in demonstrating that Defendant

Oliveri's alleged actions violate clearly established law. The actions complained of occurred on or around September of 2001. The Eleventh Circuit has found that harassment in the form of constant monitoring, checking, or issuing citations has long constituted a violation of "clearly established" law. (D.E. 272 at 34, citing Espanola Way Corp. v. Meyerson, 690 F.2d 827, 828 (11th Cir. 1982) (city commissioners' formation of building code task force which conducted frequent inspections of designated hotels and issued numerous violations, and which was designed to harass and drive hotels out of business, was sufficient to state a § 1983 claim).) Furthermore, the Eleventh Circuit in Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005), held that it has been "settled law" since 1988 that the government may not retaliate against citizens for the exercise of First Amendment rights. Id., citing Georgia Association of Educators v. Gwinnett County School District, 856 F.2d 142, 145 (11th Cir. 1988) (holding the Government may not retaliate against individuals or associations exercising their First Amendment rights "by imposing sanctions for the expression of particular views it opposes").

Record evidence in the instant case raises a material issue of fact as to whether any overzealous or harassing monitoring, enforcement, or retaliation against the Synagogue could indeed be imputed to Defendant Oliveri. Oliveri's aforementioned memo stated that "careful and vigilant monitoring" of the Synagogue was "required." (D.E. 294 at Ex. A.) George Albo, an administrator for Plaintiff, confronted a code enforcement officer issuing tickets to cars parked on Synagogue property and was told by the officer that Oliveri had instructed

-49-

him and his department to ticket and "keep a close eye on" the Synagogue.[13] ("Albo Deposition," D.E. 192 at 206:2-19.)  Gonzalez also testified that the enforcement level against the Synagogue was "directly related" to requests by Defendant Oliveri. (Gonzalez Deposition at 240:3-9.)  The Court therefore finds that there is a genuine issue of material fact as to whether Defendant Oliveri's actions violated clearly established law, namely Plaintiff's right to the free exercise of religion.  The Court further finds that the above stated actions could reasonably engender the discouragement of Synagogue members wishing to attend religious services, in violation of the First Amendment. Bennett, 423 F.3d at 1254-55. Accordingly, for purposes of Plaintiff's section 1983 claim, Defendant Oliveri has failed to either meet his burden under part one of the Eleventh Circuit's test for qualified immunity, or overcome Plaintiff's showing under part two.  The Court thus declines to grant qualified immunity to Defendant Oliveri on either of Plaintiff HCS's claims against him.

### 3.   Equal Protection Claim

Finally, Defendant Oliveri argues that there is no genuine issue with respect to Plaintiff's Equal Protection claim against him, and that summary judgment should be granted as a matter of law.  The Equal Protection Clause of the Fourteenth Amendment states that no State shall "deny to any person within its jurisdiction the equal protection of the laws,"

---

[13] Contrary to Oliveri's assertions, this does not constitute double hearsay, as Oliveri's statement was a directive, and thus not offered for the truth of the matter, and the code enforcement officer's statement constituted a party admission, as they were made in the code enforcement officer's capacity, concerning a matter within the scope of his agency. Fed.R.Evid. 801(d)(2)(A). Moreover, even if one could argue that Oliveri's statement was offered for the truth of the matter asserted, namely, that he did direct code enforcement to monitor the Synagogue, the statement would likewise constitute a party admission on the part of Oliveri. Id.

essentially a mandate that all similarly situated persons be treated alike. <u>City of Cleburne, Tex. V. Cleburne Living Center</u>, 473 U.S. 432, 440 (1985). The Eleventh Circuit has recognized that plaintiffs may bring an equal protection claim for the unequal administration of a facially neutral statute, so long as intentional or purposeful discrimination is shown on the part of the state. <u>E & T Realty v. Strickland</u>, 830 F.2d 1107, 1112-13 (11th Cir. 1987) <u>citing</u> <u>Snowden v. Hughes</u>, 321 U.S. 1, 8 (1944). To prevail on this selective enforcement claim, a traditional type of equal protection claim, Plaintiff must show (1) that it was treated differently from other similarly situated entities, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiff. <u>Campbell v. Rainbow City, Ala.</u>, 434 F.3d 1306, 1314 (11th Cir. 2006) <u>citing</u> <u>Strickland v. Alderman</u>, 74 F.3d 260, 264 (11th Cir. 1996).

Defendant Oliveri posits three arguments is support of his Motion. First, he contends that discriminatory intent is a required showing for an equal protection claim based on selective enforcement. In this regard, Oliveri contends that the statements cited by Plaintiff in the record cannot establish discriminatory intent when proper context is provided. (D.E. 250 at 7-8.) Second, Defendant Oliveri maintains that the home of Rosa Lopez is not similarly situated for purposes of the claim because it is not within Oliveri's district. (<u>Id.</u> at 8-12.) Third, Defendant maintains that Plaintiff has not shown unequal treatment. (<u>Id.</u> at 12-14.) The Court will address each in turn.

Defendant Oliveri is correct that discriminatory intent is an element of an equal

protection claim based on selective enforcement. <u>E&T Realty v. Strickland</u>, 830 F.2d 1107, 1113 (11th Cir. 1987). However, Defendant fails to demonstrate that there exists no genuine issue of material fact as to whether discriminatory intent can be inferred from his comments. Plaintiff HCS has alleged that Defendant Oliveri made the following public comments.[14] First, at a Commission meeting, Oliveri allegedly said, "it's almost common sense and reasonable that 'the Chabad' will never fit in Hollywood Hills." (D.E. 125 at ¶ 41 (internal quotation marks added).)   Second, Defendant Oliveri allegedly stated at a subsequent Commission meeting, "[w]e're talking about our neighborhoods here.   We're talking about neighborhoods having a smell." (<u>Id.</u> at ¶ 47.)   Third, when asked why Rosa Lopez did not need to apply for a Special Exception, Oliveri allegedly stated, "it's a miracle to true believers and the venue cannot be changed since the Virgin Mary visits that particular home... if you people know anything about the Catholic religion, that's called a vision.   To Christians and Catholics, that is considered a miracle.   That's not establishing a house of worship.   That is a miracle." (<u>Id.</u> at 54.)   Fourth, Oliveri allegedly said to the Mayor at a Commission meeting, "[w]e all interpret our faith and religion in a personal manner and clearly a lot of disturbance out there with the parking, a lot of people were disturbed to live close to them on this side, but the spiritual benefit that may be achieved by the people going there once a month far outweighed the inconvenience on that occasion." (Oliver Deposition

---

[14] Though little record evidence has been provided to support these comments, neither Party disputes either that they were made or that they were made publicly.   Defendant Oliveri has admitted to making some of the alleged statements.   <u>See</u> "Oliveri Deposition," D.E. 192 at 110:5-25 (stating that comment about spiritual benefits outweighing the inconvenience of the occasion at the Lopez house was made at a late hour and came out the wrong way.)   For the rest, Defendant has contested only the context, not the content. (<u>See</u> D.E. 250 at 2-4.)   This constitutes a genuine issue of material fact.

at 110:2-25.) Viewing these statements in the light most favorable to Plaintiff, the Court finds that discriminatory intent can be imputed on the part of Defendant Oliveri. Moreover, the record evidence previously cited from the Depositions of Mayor Giulianti and Jacqueline Gonzalez themselves create an inference of discriminatory intent sufficient to survive summary judgment. Therefore, Defendant has not met his burden of demonstrating that there is no genuine issue of material fact with respect to this element.

Second, concerning the residence of Rosa Lopez, Defendant Oliveri argues that because the residence is outside the confines of his district, he could not have pursued enforcement or monitoring actions against it, even had he wished to. (D.E. 309 at 16.) Moreover, Defendant Oliveri argues that no other group of neighbors has complained about places of worship in the same manner as those complaining about Plaintiff. (Id.) The Court finds this contention highly dubious. Under the existing Special Exception zoning scheme, Defendant Oliveri had the authority to vote and file appeals on Special Exception applications in any district in the City of Hollywood. Moreover, this argument assumes that Defendant Oliveri had the authority to direct code enforcement in his district in the first place, a contention that has been disputed by record evidence. Further, as stated earlier, testimony from George Albo indicates that Defendant Oliveri had instructed code enforcement officers to ticket the Synagogue and monitor Plaintiff closely. (Albo Deposition at 206:2-19.) Albo further testified that he witnessed code enforcement officers ticketing vehicles parked at the Synagogue while ignoring other similarly parked vehicles in the

immediate area, including directly across the street from HCS property. (Id. at 202:4-204:11, 210:20-213:1.) Therefore, this evidence raises a genuine issue of material fact that there were cars parked similarly on other nearby properties that were treated differently at the behest and direction of Defendant Oliveri.

Finally, other evidence indicating unequal treatment has been raised by Plaintiff, despite Defendant Oliveri's arguments to the contrary. Such evidence includes Gonzalez's testimony about Defendant Oliveri's singular focus on Plaintiff, including her testimony that Oliveri criticized her for not taking vigorous enough enforcement actions against the Synagogue, despite having sent code enforcement there sometimes twice a day (Gonzalez Deposition at 204:18-205:4) and the testimony from Mayor Giulianti stating that in "15 years I have never seen such a single focus." (D.E. 352, Ex. A at 413:14-20.) Thus, Defendant Oliveri has not met his burden of demonstrating there is no genuine issue of material fact with respect to any element of Plaintiff's equal protection claim, and summary judgment is therefore inappropriate.

Accordingly, it is

**ORDERED AND ADJUDGED** that

1.    Defendant City of Hollywood's Motion for Summary Judgment Against Plaintiff, Hollywood Community Synagogue (D.E. 247), filed April 24, 2006, is **GRANTED in part and DENIED in part**, as follows:

   a.    Summary judgment is **granted** in favor of Defendant City of

Hollywood on Plaintiff HCS's Substantive Due Process Claims

(**Counts XIV and XV**) as they relate to equitable estoppel, but

**denied** as to the remainder of those claims.

    **b.**    Summary judgment is **denied** as to all other remaining claims.

**2.**    Defendant City of Hollywood's Motion for Summary Judgment against

Plaintiff United States, filed March 10, 2006, is **DENIED.**

**3.**    Defendant Sal Oliveri's Motion for Summary Judgment (D.E. 250), filed

April 24, 2006, is **DENIED**.

 

**DONE AND ORDERED** in Chambers at Miami, Florida, this _27_ day of June,

2006.

 

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

 

cc:    U.S. Magistrate Judge Theodore Klein

       All Counsel of Record

       **Case No.04-61212-CIV-LENARD/KLEIN**